STATE *ex rel.* RICE, ATTY. GEN., *v.* STEWART *et al.*

(Division B. Oct. 24, 1938.)

[184 So. 44. No. 33292.]

204

(Division B. Jan. 2, 1939.)

[185 So. 247. No. 33292.]

**W. W. Pierce,** Assistant Attorney General, for appellant.

Mize, Thompson & Mize, of Gulfport, and **J. O. S.** Sanders, of Jackson, for appellant.

**Gardner & Backstrom,** of Gulfport, for appellees, Mrs. Grace Jones Stewart and W. T. Stewart.

**Chas. R. Haydon,** of Gulfport, for appellees, J. C. Bonham and Paul Bonham.

216

**Gardner & Backstrom,** of Gulfport, for appellees, Mrs. Grace Jones Stewart and W. T. Stewart, on Suggestion of Error.

218

Argued orally by **R. W. Thompson, Jr.**, and **W. W. Pierce**, for appellant, and by **Oscar Backstrom**, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This is an appeal from a final decree of the chancery court of Harrison County, Mississippi, sustaining a general demurrer of all of the appellees and a sub-joined plea of res adjudicata interposed by the appellee, Mrs. Grace Jones Stewart, to the bill of complaint filed by appellant.

Among other things, the bill of complaint charged that

Bayou Bernard in Harrison County, Mississippi, an inlet of the Mississippi Sound, is a navigable body of water and has at all times been such from the time of the admission of the State of Mississippi as a State into the Union, and has at all times been subject to the daily ebb and flow of the tides; that said bayou has always been used and treated as an artery of commerce; and that water craft of all kinds have been accustomed to ply the said stream in the furtherance of commerce and navigation. That the State of Mississippi as a sovereign State was at all times clothed with the right to regulate and control the use of the waters of said bayou, subject only to the superior rights of the United States to regulate navigation and commerce in, over and upon the same; but that the said State of Missouri, however, owns as sovereign the bed of the said body of water and particularly all of the mineral deposits therein, and more particularly all sand and gravel therein deposited.

That the appellees set up and installed on the banks of said Bayou Bernard certain large machinery to be used, and which was used, in dredging sand and gravel from the bed of said bayou for commercial purposes, and that since the beginning of the said operations they have extracted and removed from the bed thereof a large quantity of sand and gravel, aggregating about 300,000 cubic yards of the value of approximately $400,000. That the appellees have at all times been aware of the fact, or by the exercise of reasonable diligence could have known, that the sand and gravel being removed by them from the bed or bottom of Bayou Bernard was the property of the State of Mississippi by reason of the fact that the same is and was, at all times covered by said operations, navigable water, and the place where said dredging was being done was below mean high tide and was within the navigable waters of said Bayou Bernard.

The bill further charged that the operation carried on by appellees constitutes serious interference with com-

merce and navigation and the right of free fishing in the said Bayou Bernard; that the claims asserted by the defendants to any sort of title, right or interest therein cast doubt, cloud or suspicion on the title of the State of Mississippi; and the bill prayed for a personal decree for damages on account of the alleged trespass complained of.

The general demurrers challenge the sufficiency of the bill in law and in equity to state a cause of action. The plea of res adjudicata set forth that the State of Mississippi had theretofore, by and through J. B. Gully, State Tax Collector, filed its suit in said courts on identically the same cause of action involved in this cause, and against the same defendants, and that the chancery court having dismissed this former suit, and its decree in that behalf having been affirmed by the Supreme Court, Gully v. Stewart, 178 Miss. 758, 174 So. 559, such former decree and judgment were res adjudicata of the issues involved herein; and also that the State of Mississippi, through its Attorney General, had been advised of the pendency of the former suit, or charged with knowledge thereof, and was estopped to again litigate this alleged cause of action against appellees.

Considering first the plea of res adjudicata, it will be found that in the case of Gully, State Tax Collector, v. Stewart, 178 Miss. 758, 174 So. 559, the court held, without qualification, and without deciding any other question, that: "The tax collector is without authority to sue for an unliquidated demand growing out of tort." And, since the State, as a party litigant, is subject to all the rules governing the procedure of the courts in other cases, and entitled to all the rights and remedies to which individuals are entitled in a given state of case, as provided for under Section 6002 of the Mississippi Code of 1930, the State could not be bound by an appearance in court on its behalf by an unauthorized official to any greater extent than an individual could be bound by the

act of a person assuming to sue on his behalf without authority. Weems v. Vowell, 122 Miss. 342, 84 So. 249; Humphreys County v. Cashin, 128 Miss. 236, 90 So. 888; Hirsch Brothers & Company v. Kennington, 155 Miss. 242, 124 So. 344, 88 A. L. R. 1; 2 Ency. of Pleading and Practice, page 690. The State did not legally become a party to the former suit, and its appearance therein was not entered by anyone authorized so to do. The State did not invoke the aid of the court in the former suit, and not having invoked the aid of the court is not bound by the decree therein rendered. In other words, the court could not have acquired jurisdiction over the sovereign state by reason of the unauthorized act of one of its officials in assuming to appear on its behalf. Henry v. State, 87 Miss. 1, 39 So. 856. The state tax collector is authorized to represent the State and sue for its benefit on the causes of action mentioned in Sections 6986, 6987, 6988, 6993, 6994 of the Code of 1930, and other enactments by which such authority may be conferred. A judgment resting on his unauthorized appearance in any other case is a nullity insofar as the rights of the State are concerned.

Moreover, since the former suit was disposed of on a ground purely technical, where the merits did not come into question the adjudication is limited to the point actually decided, and cannot preclude a subsequent action brought in a way to avoid the objection which proved fatal in the first. Agnew v. McElroy, 10 Smedes & M. 552, 48 Am. Dec. 772; Mosby et al. v. Wall, 23 Miss. 81, 55 Am. Dec. 71.

Also, there being no motion made to hear the plea of res adjudicata preliminarily, and the former suit not being disclosed by the bill of complaint herein to be barred, so as to be reached by the demurrers, the plea was not properly before the court below when the demurrers were sustained and the bill dismissed. Griffith's Chancery Practice, Sections 67, 324 and 325.

The matters of estoppel plead would not, in our opinion, even though proven, preclude the State from asserting any rights that it may have arising out of the facts alleged in the present suit.

Regarding the contention of appellees that the state land commissioner, and not the attorney general, is vested with the statutory authority to bring a suit of this character, we find nothing in the statutes conferring jurisdiction on such officer over tide-water lands. They are not within his jurisdiction within the meaning of Sections 6011, 6021 and 6022 of the Code of 1930. On the other hand, the attorney general is vested with both statutory and common law authority to represent the sovereign in the enforcement of its laws and protection of public rights. Capitol Stages, Inc., et al. v. State ex rel. Hewitt, District Attorney, 157 Miss. 576, 128 So. 759; 2 R. C. L. 915.

A decision of each of the foregoing questions has been rendered either necessary or expedient in view of our conclusion that the bill of complaint is sufficient to withstand the general demurrer and that the cause must be reversed for trial on the merits.

In admitting that the tide-water ebbs and flows at the place in Bayou Bernard where the dredging of the sand and gravel occurred, as alleged by the bill of complaint, the demurrers virtually confess the proposition that the State, in its sovereign capacity, owns the title to the bed of the bayou as trustee for the people, charged with the duty of safeguarding it for the purpose of insuring its free use by the public for navigation, commerce and free fishing, subject only to the paramount right of the United States thereover for navigation and commerce. However, the decision of this question need not, and, because of its importance to the people of Mississippi as a precedent in declaring the relative rights of the public as distinguished from those of private persons in the mineral deposits, as well as in soil beneath tide waters in our

great coastal area, it should not rest upon a mere admission of the pleadings in the particular case. Without changing the result of the decision to be rendered on the issue here presented by the pleadings, and in order that the correct rule may be applied in determining the rights of the respective litigants in a trial on the merits, we shall now look beyond what may appear to have been admitted by the demurrers and determine the extent of the State's title in the premises, as established and confirmed by both the common law and the trend of judicial decisions, state and federal.

Appellees, reasoning from and relying upon the principles announced in the cases of Morgan et al. v. Reading, 3 Smedes & M. 366, and The Steamboat Magnolia v. Marshall, 39 Miss. 109, involving title to land below high-water mark on the Mississippi River, a fresh-water stream, and which cases were followed as local law in Archer v. Gravel Company, 233 U. S. 60, 34 S. Ct. 567, 58 L. Ed. 850; and Archer v. Levee Commissioners, 158 Miss. 57, 130 So. 55, now make the contention that they, as riparian owners on Bayou Bernard, own the title of the bed of such body of water, the same as if it were a fresh water stream, with the right to remove sand and gravel therefrom for commercial, or other purposes, not inconsistent with the free use of the navigable waters for commerce or navigation. The cases above referred to hold that a riparian owner on the Mississippi River, where the tide does not ebb and flow, owns the title of the bed of the river to the center of the stream, subject only to the public easement in favor of commerce and navigation; and in the two latter cases it was held that such riparian owner was entitled to recover the value of sand and gravel removed therefrom in the commission of a trespass. Hence, it is argued that inasmuch as the Mississippi River is a navigable stream above where the tide ebbs and flows as well as below, and is more susceptible to navigation than many of the inlets or arms of the sea

wherein the tide ebbs and flows, there is no reasonable basis for the distinction which recognizes the title of a riparian owner to the bed of a navigable freshwater river to the center of the stream, and at the same time denies to him such title to the bed of a smaller stream or arm of the sea, where the tide ebbs and flows. We shall not attempt to argue the reasonableness or unreasonableness of the distinction, but shall concern ourselves only with determining whether or not such distinction does in fact exist.

It is well settled that upon the question involved herein, Mississippi adopted the common law as it prevails in England. The rule is announced, in substance, in 3 Kent's Comm. 427, as a settled principle in the English law, that the right of soil of owners of land bounded by the sea, and on other navigable waters, where the tide ebbs and flows, extends only to high-water mark; that the shore below ordinary high-water belongs to the State, as trustee for the public; and that in England the crown, and in this country the people, have the absolute proprietary interest in the same; that the sovereign is trustee for the people, and the use of navigable waters is inalienable, but that the shores of navigable waters, and the soil under them, belong to the state in which they are situated, as sovereign; that the right of sovereignty in public rivers above the flow of the tide is the same as in tide waters; that they belong to the public, except that the proprietors adjoining such rivers (referring to freshwater rivers) own the soil.

In Morgan, et al. v. Reading, supra, Mr. Justice Sharkey recognizes and discusses the common law distinction between the rights of a riparian owner on freshwater streams and on bodies of water where the tide ebbs and flows. He quotes the rule as laid down by Chancellor Kent in his commentaries to the effect that grants of land on rivers, above tide water, belong to the proprietor of the bank, and extends to the center of the stream. Then,

after reviewing the authorities, he stated, among other conclusions reached, that: "There is a material difference between rivers which are navigable, and those which are not navigable, according to the Common Law meaning of the term. On rivers not navigable, the riparian proprietor, by construction of the Common Law, owns to the thread of the stream, unless restricted by the grant." He had already stated elsewhere in the opinion that "The phrase 'navigable river,' has a technical meaning in the Common Law. A river is navigable in the technical sense, as high up from its mouth as the tide flows. Angell on Watercourses, 204, 205. Above that it may be a common highway, subject to the use of the public for navigation according to the common law acceptation of the term, but it is not technically a navigable river. The soil under a river which is navigable in the technical sense, does not belong to the riparian owners, but to the public." Applying this rule, the decision, in effect, holds that, although the act providing for the admission of Mississippi into the Union declared that the Mississippi River, and the navigable rivers and waters leading into the same, or into the Gulf of Mexico, should remain common highways, and forever free to the citizens of the United States, etc., a riparian owner adjacent to the Mississippi River owned the soil to the thread of the stream, notwithstanding that such river was navigable in fact. In other words, it was the opinion of the court that since this river was not navigable at the point in question within a technical sense, within the meaning of the common law adopted by the State, the title of the riparian owner did not stop at high-water mark.

Likewise, in the case of The Steamboat Magnolia v. Marshall, supra, Mr. Justice Harris, in recognition of the distinction "long declared and recognized by learned judges and law writers, and deemed by them of so much excellence and importance as to be regarded as beyond all question," quoted from the common law distinction

made by Lord Chief Justice Hale in his treatise, De Jure Maris, as follows: "That rivers not navigable (that is, freshwater rivers of what kind soever) do, of common right, belong to the owners of the soil adjacent. But that rivers, where the tide ebbs and flows, belong to the State or public." He further said "In obedience therefore to the laws and comity of nations, it became, at an early period in its history, the doctrine of the common law, that grants of land, by the sovereign power, bordering on tide water, extended only to high water mark." He then proceeds to say that: "On the other hand, a doctrine wholly opposite to this, and founded upon reasons equally clear and satisfactory, was established in relation to freshwater streams, whether having capacity for navigation or not, which were intra-territorial, and over which the government had exclusive right and dominion," meaning thereby to say that as to such freshwater streams, the title of the riparian owner did not stop at high-water mark but extended to the thread of the stream. He then declared that "a more perfect regulation could not be devised," reasoning that the jus privatum of the riparian owner is always charged with, and subject to, the jus publicum in regard to commerce and navigation. Since the argument made in that opinion is so strenuously urged by counsel for appellees as a ground for the court now holding that the doctrine as to the rights of a riparian owner in the bed of a navigable fresh-water stream should be extended and applied to the soil beneath tide water in this State, we are constrained to further point out that in The Steamboat Magnolia Case, the court took cognizance of, and quoted extensively from, an opinion of Chief Justice Tilghman in the case of Carson v. Blazer, 2 Bin. (Pa.), 475, 477, 4 Am. Dec. 463, decided in 1810, (wherein he had questioned the correctness of the common law distinction between tide-water and fresh-water streams, for the first time in any case in the United States, or elsewhere, where the common law prevails, and argued

that it should not be applied here due to the difference in the larger rivers in America as to navigation when compared to the streams in England, which he contended were not usually navigable above the ebb and flow of the tide), and then strongly condemned the view of Justice Tilghman in that regard, citing and reviewing many authorities to show that the common law distinction as to fresh-waters and tide-waters had been preserved in many of the jurisdictions of this country. He then proceeded to apply the distinction to the case at hand.

The reason and logic of the opinion of Justice Tilghman in the case of Carson v. Blazer, supra, was applied by the Supreme Court of the United States in the case of The Propeller Genesee Chief v. Fitzhugh, 53 U. S. (12 How.) 443, 13 L. Ed. 1058, when the court, overruling its earlier decisions, held that the admiralty and maritime jurisdiction of the courts of the United States extended to all public navigable waters, although above the flow of the tide from the sea, on the ground that navigability and not the ebb and flow of the tide should control sovereign rights—Chief Justice Taney, taking the same line of argument used in the Carson Case, supra, and held that in England, where there are no navigable streams beyond the ebb and flow of the tide, the description of the admiralty jurisdiction as confined to tide waters was a reasonable and convenient one, and was equivalent to saying that it was confined to public navigable waters; but that, when the same description was used in this country the description of a public navigable water was substituted in the place of the thing intended to be described; and, under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on, after it had ceased, from a change in circumstances, to be the true description of public waters. But, it was said in Packer v. Bird, 137 U. S. 661, 11 S. Ct. 210, 34 L. Ed. 819, that: "As an incident of such ownership, the right of the riparian

owner, where the waters are above the influence of the tide, will be limited according to the law of the state, either to low or high water mark, or will extend to the middle of the stream.'' This principle of the common law as to fresh-water streams had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and laid the foundation for the doctrine with regard to the ownership of the soil in navigable waters above the tide-water at variance with what, in the opinion of many courts, may be considered sound principles of public policy.

Nevertheless, since it has been repeatedly held by the Supreme Court of the United States that the title of a riparian owner to the soil beneath navigable waters is a question to be determined by the local law of the state in which the same are situated, our own court has continued to recognize the common law distinction hereinbefore referred to, whether a reasonable basis for the same exists in this country or not, by holding in the cases of Morgan et al. v. Reading, 3 Smedes & M. 366; The Steamboat Magnolia v. Marshall, 39 Miss. 109; and Archer v. Levee Commissioners, 158 Miss. 57, 130 So. 55, that the riparian owner owns the bed of navigable fresh-water streams to the center thereof—establishing a rule of property in that regard; and too, by holding in the cases of Martin v. O'Brien et al., 34 Miss. 21; Money et al. v. Wood, 152 Miss. 17, 118 So. 357; and Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291, that the state holds the title to the land beneath tide-waters, as trustee for the people, subject only to the paramount right of the United States to control commerce and navigation.

In our opinion, the former decisions of this court as to the ownership of the soil beneath tide waters is in accord with the decisions of all of the courts of this country where the common law prevails. It was held in Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331, 336, that under the common law, the title of land beneath

the rivers and arms of the sea, where the tide ebbs and flows, belonged, jus privatum, to the King as the sovereign; and that the dominion thereof jus publicum, was vested in him as the representative of the nation and for the public benefit. It was said in Pollard et al. v. Hagan et al., 3 How. 212, 11 L. Ed. 565, that [1], "the shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively. [2], The new states have the same rights, sovereignty, and jurisdiction over them as the original states." Then, as to the rights held by the original states, it was said in Munford v. Wardwell, 6 Wall. 423, 432, 18 L. Ed. 756, that: "When the Revolution took place, the people of each State became themselves sovereign, and in that character hold the absolute right to all their navigable waters and the soils under them, subject only to the rights since surrendered by the Constitution." Again in Appleby v. New York, 271 U. S. 364, 46 S. Ct. 569, 70 L. Ed. 992, it is said that: "Upon the American Revolution, all the proprietary rights of the crown and Parliament in and all their dominion over lands under tide-water vested in the several states," etc. See, also, the rule announced in 27 R. C. L. 1356-1359, and in the cases of Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997; Weber v. State Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798; Goodtitle v. Kibbe, 9 How. 471, 13 L. Ed. 220; McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248; and Knight v. United States Land Association, 142 U. S. 161, 12 S. Ct. 258, 35 L. Ed. 974. In the Knight Case, Mr. Justice Lamar, in delivering the opinion of the court, said: "It is the settled rule of law in this court that absolute property in, and dominion and sovereignty over, the soils under the tide-waters in the original states were reserved to the several states, and that the new states since admitted have the same rights, sovereignty, and jurisdiction in that behalf, as the origi-

nal states possess within their respective borders." And, in the more recent case of Borax Consolidated, Ltd. et al. v. City of Los Angeles, 296 U. S. 10, 56 S. Ct. 23, 80 L. Ed. 9, all of the foregoing authorities are cited with approval, and it was therein expressly held that the Federal government has never had the power to convey land beneath tide waters within the borders of a state, after the admission of such state into the union. Then, how could the patent through which appellees in the case at bar derive their title as riparian owners have conveyed the bed of Bayou Bernard?

We are unable to agree with the contention of appellees that because of the fact that our local decisions have followed the common law in holding that a riparian owner on a fresh-water stream has title to the soil to the center thereof, we should now depart from the same common law rule, so universally recognized, to the effect that the state owns the title to land beneath tide-waters, subject only to the right of the United States to control commerce and navigation, where both rules are consistent with the principles of the common law as adopted in our State, though they may be inconsistent so far as their practical application is concerned.

From the foregoing conclusions, it follows that we hold the State of Mississippi to be the absolute owner of the title of the soil, and of the minerals therein contained, in the beds of all of its shores, arms and inlets of the sea, wherever the tide ebbs and flows, as trustee for the people of the State, and subject only to the paramount right of the United States to control commerce and navigation, with the consequent right to use or dispose of any portion thereof, when that can be done without impairment of the interest of the public in the waters, subject to the paramount right above mentioned, and not inconsistent with Section 81 of our state constitution. Illinois Central R. Company v. Illinois, 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018; Money et al. v. Wood, 152 Miss. 17, 118 So. 357;

but without the right to convey the title of the land beneath such waters below high-water mark in fee simple, Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291, the State being without authority to surrender its sovereignty or cease to administer the trust for the purposes intended, or to unreasonably interfere with the riparian proprietor's right of access to and from such waters and the reasonable use thereof as well as of the land subject to tide-water, as a necessary incident to the reasonable enjoyment of his adjacent land; nor with the right of free fishing by the public generally. Rouse v. Saucier's Heirs, supra.

Therefore, it now becomes necessary in the present case to determine whether the State, as such trustee, is entitled to recover the value of the sand and gravel alleged to have been dredged for commercial purposes from the bed of Bayou Bernard where the tide ebbs and flows therein. The rule is announced 27 R. C. L. 1369 that: "Where the title to the bed of a navigable stream is in the State, no person has the right as against it to take or appropriate sand, gravel, phosphate, or the like therefrom without its consent or license." It is provided by Sec. 6002 of the Mississippi Code of 1930 that the State is entitled to bring all actions and have all remedies to which individuals are entitled in a given state of case. In the Rest. of Law of Trusts, it is declared in Sec. 280 that: "A trustee can maintain such actions at law or suits in equity or other proceedings against a third person as he could maintain if he held the trust property free of trust." Further, in subsection (a): "If a third person commits a tort with respect to the trust property, the trustee can maintain such actions at law as he could maintain by reason of his ownership of the property if he held it free of trust." Likewise, subsection (c) recognizes the jurisdiction in equity to enjoin or redress such torts.

In People v. Hyman, Sup., 136 N. Y. S. 145, which was

an action brought to restrain the defendant from removing sand and gravel from the bed of the Niagara River and to recover damages for sand and gravel theretofore taken, which was claimed to be the property of the State of New York, on the theory that the state owned the title to the bed of the said Niagara River, the court held that the complaint stated facts sufficient to constitute a cause of action for trespass. In State v. Southern Sand Company, 113 Ark. 149, 167 S. W. 854, a statute forbidding the taking of gravel from the bed of a navigable stream by any corporation except on payment of a stated sum per cubic yard into the state treasury was upheld. The court said: "Now, the state cannot delegate its trusteeship by disposing of navigable waters or beds thereof, for one Legislature might resume a power which had been surrendered by its predecessor; but it is quite another thing to say that the Legislature, in the exercise of its control over the beds of streams, cannot grant the right, upon terms or for a price named, to take sand or gravel, call it a sale, or a regulation, as it may please one to term it. The bed of the stream being held by the sovereign for the benefit of the citizens, that right may be enjoyed in the way that the legislative branch of government may determine for the benefit of the public, and it is not inconsistent with a public use to require those who actually take sand and gravel to pay for it so that the benefits may be diffused among all of the people of the state. . . It cannot be claimed that the disposal or sale of sand or gravel, in the bed of the river, is a relinquishment of the state's control over the common property, or that it impairs the right of common enjoyment, or that it interferes with navigation. . ." In the case of State v. Akers et al., 92 Kan. 169, 140 P. 637, Ann. Cas. 1916B, 543, it was held that the state was vested with the power to impose a royalty upon the taking of sand for commercial purposes from the bed of a stream, the title of which the

state held as trustee for the benefit of the people, and in upholding such a statute it was declared that: "The court is well aware of the facts that the state of Oklahoma is leasing for royalties the oil beds beneath the Arkansas river (U. S. v. Mackey, 214 F. 137); and that in many of the states the right to prospect and obtain the oil and other mineral products beneath the bed of the public rivers is a valuable one." And, the court took cognizance of the contention that some of the states receive enormous revenues from the sale of iron and copper ore taken from the beds of the navigable lakes of those states. In the case of State v. Jefferson Island Salt Mining Company, Inc., 183 La. 304, 163 So. 145, the State of Louisiana sued the salt company for the value of a quantity of salt taken from the bed of a navigable lake, the title of which the court held was vested in the state in its sovereign capacity as trustee for the people. The Supreme Court of Louisiana affirmed a judgment rendered for damages in said cause in the sum of $1,165,419.54, as the value of the salt taken, and a petition for certiorari was denied by the Supreme Court of the United States, 297 U. S. 716, 56 S. Ct. 591, 80 L. Ed. 1001, and a petition for rehearing was also denied, 297 U. S. 729, 56 S. Ct. 667, 80 L. Ed. 1011. In fact, it is generally recognized that the taking of ore, sand and gravel and other minerals from the bed of a stream by individuals or corporations for commercial purposes is incompatible with the absolute title of the state therein as trustee for the public. The state's right to recover the value of such deposits so taken has been upheld wherever the question has arisen except in the case of State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139, wherein the court held that while the defendants had no right to take ore from the bed of the body of water in question, and the state was entitled to injunctive relief to prevent such action, it was not entitled to recover its value. By analogy, however, our court has

upheld the right of the State, as trustee for the people, to recover damages for a trespass on behalf of the beneficiaries of a trust in the following cases: Jefferson Davis County v. Sumrall Lumber Company, 94 Miss. 530, 49 So. 611; Robertson, State Revenue Agent v. Weston Lumber Company, 124 Miss. 606, 87 So. 120. In the case of Jefferson Davis County v. Lumber Company, supra, in upholding the right of the county, as an agency of the State, to recover the value of timber cut for commercial purposes from a Sixteenth Section of land, the court said: "The title to sixteenth section land is in the state; but it holds same in trust for the support of the public schools of the township wherein the same is situated. Chapter 129 of the Code of 1906, and particularly section 4701 thereof, confers upon the several counties, through their respective boards of supervisors, under the general supervision of the land commissioner, jurisdiction and control of sixteenth section land, to be exercised, of course, within the terms of the original trust . . ." The trust referred to was that created by the articles of agreement and cession between Georgia and the United States when the lands were ceded by that state to the United States in trust for the states to be created, and after the creation of this state out of the territory ceded the title and control of these sections, situated therein, vested in the state in trust for the inhabitants of the several townships. In Robertson v. Lumber Company, supra, the same rule of liability was applied, and recovery was had by the state as trustee, for the cutting of timber from Sixteenth Section lands. It is worthy of mention that both these Sixteenth Section lands and the soil beneath tide-waters in the State were acquired by the United States in trust for the future State, and that thereafter the State of Mississippi became the trustee of the one the same as it did of the other, holding the title in one instance for the benefit of the inhabitants of the townships, and in the other for the people of the entire

state. We are therefore unable to hold that the State, as trustee, can recover damages for trespass to the trust property in one instance, and be denied the right of recovery in the other.

As to the measure of damages to which the State would be entitled, in the event of recovery, the law is well settled that where one has committed a wilful trespass he is liable for the actual value of the property taken, without any allowance or deductions for labor or expenses incurred in taking and removing it. But, if the act of the alleged trespasser is the result of an honest mistake, the measure of damages is the value of the property at the time and place of its severance and removal, less the cost of production.

The cause must be reversed for a trial on the merits, in accordance with the principles of law herein announced.

Reversed and remanded.

### On Suggestion of Error.

**Anderson, J.,** delivered the opinion of the court on suggestion of error.

Appellees contend that the court was in error in holding that the only question decided in the case of Gully, State Tax Collector, v. Stewart et al., 178 Miss. 758, 174 So. 559, was the want of authority on the part of the State Tax Collector to bring the suit; and they insist that, since the general demurrer sustained by the Chancellor in that case went to the question of whether the bill of complaint filed by the State Tax Collector stated a cause of action on the merits, the affirmance of the decree on appeal is res adjudicata of the suit now brought by the State on relation of its Attorney General for the same cause of action. It is true that the Chancellor based his decree of dismissal of the former suit both on the ground of the alleged insufficiency of the bill of complaint to state a case for relief on the merits and on the want of authority of the State Tax Collector to sue; nevertheless,

the court confined its decision on appeal, as it may do in any case in affirming a decree of dismissal, to the single proposition that the complainant in the court below was without authority to invoke the jurisdiction of the court to try the alleged cause of action. The question of whether the bill of complaint was sufficient to state a case on the merits was neither considered nor discussed in the opinion rendered therein.

Neither do we think that the opinion heretofore rendered in the case at bar is an advisory one to the extent of holding the plea of res adjudicata not well taken. Whether such plea was properly before the Chancellor or not at the time he sustained the demurrers and dismissed the bill in this cause, it is shown by his opinion in the record that his action in entering the decree of dismissal was based both on the ground that the Gully Case, supra, was res adjudicata and that the bill of complaint stated no cause of action on the merits. Appellees argued in their original brief that the decree should be affirmed on either or both of the grounds assigned, and hence no error was committed when we took cognizance of the holding of the court below in regard to the plea of res adjudicata. The case was being reversed and remanded for a trial on the merits, and the decree sustaining the plea of res adjudicata was in our opinion an error of law appearing of record, which, if adhered to on a rehearing under the assumption that the question was still an open one, would prevent a trial on the merits.

It is also urged on suggestion of error that the former decision and opinion in this case overrules the cases of Morgan et al. v. Reading, 3 Smedes & M. 366; The Steamboat Magnolia v. Marshall, 39 Miss. 109; Archer v. Levee Commissioners, 158 Miss. 57, 130 So. 55; Money et al. v. Wood, 152 Miss. 17, 118 So. 357, and Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291; and abrogates the rule of property established under the rule announced in these cases. On the contrary, the opinion in the case at bar

reviews the three former decisions, whereby it is held that the riparian owner has title to the bed of a fresh water stream to the center thereof, and recognizes the rule of property resulting therefrom; and also cites the two latter decisions as authority for holding that a different rule prevails as to the bed of the shores, arms and inlets of the sea below high-water mark, wherever the tide ebbs and flows, the title to which is vested in the state as trustee for the people, subject to the paramount right of the United States to control commerce and navigation, with the consequent right on the part of the state ''to use or dispose of any portion thereof'' as specifically held in Money et al. v. Wood, supra, 118 So. 359, when that can be done without impairment of the interest of the public in the waters, and not inconsistent with Section 81 of our State Constitution; and without the right to unreasonably interfere with the riparian or littoral proprietor's right of access to and from such waters and the reasonable use thereof as well as of the land subject to tide-water as a necessary incident to the reasonable enjoyment of his adjacent land, nor with the right of free fishing by the public generally. Neither riparian nor littoral rights are disturbed by the decision in the case at Bar, as such rights are defined under the authorities hereinbefore referred to, and as expressly declared on behalf of owners of land abutting on tide-waters in the opinion delivered by Judge Truly in the case of Barataria Canning Company v. Ott, 84 Miss. 737, 37 So. 121.

Responding to the suggestion that there is no reasonable basis for a distinction between the rights of a riparian owner on all fresh water streams and those of an abutting owner on the inland tide-water streams and arms of the sea, when the same is made without regard to navigability in fact or capacity for navigation as was done in the cases hereinbefore referred to, it is sufficient to say that since the distinction had already been made and a rule of property established as to the title of ripa-

rian owners to the center of fresh water streams, even though navigable, we have no choice except to recognize such distinction in the case at bar, even though we might be of the opinion, if the case had been one of first impression, that navigability in fact or capacity for navigation would furnish a more reasonable basis for determining the title of the state and of the abutting owner in the soil below highwater mark and underneath fresh waters as well as tide-waters.

The case at bar involves only the title to the soil below high-water mark in the bed of the shores, arms and inlets of the sea, where the tide ebbs and flows, and it was expressly held in the case of Money et al. v. Wood, supra, that: "When the several states were recognized as free and independent governments by the English nation after the Revolutionary War, the ownership of, and dominion and sovereignty over, lands covered by tide-waters, and the fresh waters of the Great Lakes, within the limits of the several states, belonged to the respective states within which they were found, with the consequent right to use or dispose of any portion thereof, when that could be done without impairment of the interest of the public in the waters, subject to the right of Congress to control their navigation for the regulation of commerce;" and, further, that these rights were subject to Section 81 of the Constitution of this State. Again, the court held in the case of Rouse v. Saucier's Heirs, supra, that: "Upon the admission of the state into the Union, there became invested in the state, as trustee, the title to all of the land under tidewater, including the spaces between ordinary high and low water marks . . ."

The principles of law announced and the conclusion reached in the former opinion are fully sustained by the foregoing cases and the other authorities therein cited.

Suggestion of error overruled.