GILES, et al. *v.* CITY OF BILOXI, MISS., et al.

No. 41219          June 8, 1959          112 So. 2d 815

*Arnaud O. Lopez, Howard A. McDonnell*, Biloxi, for appellants.

*Thomas J. Wiltz,* Biloxi, for appellees, City of Biloxi, its Mayor and Commissioners, and Biloxi Bridge and Park Commission.

*Satterfield, Shell, Williams & Buford,* Jackson, for appellee, Aponaug Manufacturing Company.

GILLESPIE, J.

This is an appeal from a decree of the Chancery Court of Harrison County denying the relief prayed for in the bill of complaint. Certain interested taxpayers and property owners filed their bill of complaint against the City of Biloxi and its officials, the Biloxi Bridge and Park Commission and its commissioners, and Aponaug Manufacturing Company, a corporation, in which a decree was sought declaring certain legislative acts unconstitutional and void and adjudging a contract between the Biloxi Bridge and Park Commission, hereinafter called Commission, and Aponaug Manufacturing Company, hereinafter called Aponaug, void, and enjoining the Commission and Aponaug from proceeding with the development of Deer Island in accordance with said statutes and contract. No question is raised regarding the parties or the pleadings, and we shall proceed to state the case accordingly.

The legislative act in question was passed at the Extraordinary Session of 1955, Chapter 265, designated by the legislature and published as a Local and Private Law. This Act was amended by Chapter 814 of the Local and Private Laws of the Regular Session of the Legislature of 1958. When we refer to the Act, such reference shall be to the 1955 Act as amended by the 1958 Act.

Section 1 of the Act provides that the City of Biloxi, Mississippi, shall have the power by ordinance to establish, as a municipal agency of said city, the Biloxi Bridge and Park Commission, composed of three members, and provides for the appointment of the commissioners and their tenure of office.

Section 2 provides that the Commission shall have the power to sue and be sued, contract and be contracted with, and to exercise the power of eminent domain to acquire property for the accomplishment of the purposes for which such Commission was created.

Section 3 provides for the organization of the Commission and other matters not of interest to this suit.

Section 4 of the Act is as follows: "Said Bridge and Park Commission shall have the following, among other powers:

"(a) To acquire for park, recreation, (harbor development) and other similar purposes by the exercise of eminent domain or otherwise, and by gift, grant or purchase, for any purpose of this Act, an island or islands in whole or in part, situated in the Gulf of Mexico, or in the Mississippi Sound and lying within Harrison County, Mississippi, and within two (2) leagues of the nearest point in the corporate limits of the City of Biloxi, Mississippi;

"(b) Said Commission shall have the power to acquire by gift, grant or purchase such portion or portions of such island or islands as it may find to be needed for use in financing the public improvements herein set forth. Prior to the acquisition of any such real estate, the commission shall, by resolution spread upon its minutes, find, determine and adjudicate that the property to be so acquired is needed to aid in the financing of the improvements under this Act. Said commission shall have the power to fill in and reclaim submerged lands adjacent to any such island or islands and to develop and utilize the same for any of the purposes

set forth in this Act, including the financing of the public improvements herein authorized;

"(c) To construct, build, maintain, operate, reconstruct and repair a bridge or bridges or a causeway or causeways or a tunnel or tunnels or any combination thereof connecting any island in Harrison County, Mississippi, acquired in whole or in part by the commission, with the main land, the point of connection of any such bridge, causeway or tunnel with the mainland may be within or without the corporate limits of the City of Biloxi, Mississippi. Said commission shall further have the power to acquire by gift, grant, purchase, the exercise of eminent domain, or otherwise, land for approaches to any such bridge, causeway or tunnel, and to construct, build, maintain, operate, reconstruct and repair approaches to any such bridge, causeway or tunnel;

"(d) Said commission shall have the power to establish, acquire, complete, enlarge, ornament, build, rebuild and improve in, on or about any island acquired by the commission, public parks, boulevards, bridges, viaducts and approaches thereto, wharves, piers, jetties, air landing fields, basins, shore protection works, pleasure grounds and ways, walks, pathways, driveways, roadways, highways and all public works, grounds or improvements, buildings, field houses, stadium, shelters, conservatories, schools, golf courses, museums, service shops, power plants, structures, playground devices, boulevard and building lighting systems and all of the types of permanent improvement and construction necessary to render the property under the control of said commission usable for the enjoyment thereof as public parks, parkways, boulevards and pleasureways or otherwise, as provided in this Act;

"(e) Said commission shall have power to permit private persons or corporations to use any property under the control of the commission for the above purposes for the benefit of the public, and shall have power to

lease property acquired by it to private persons or corporations for such purposes upon such terms and for such consideration as it may determine;

"(f) Said commission shall have power to sell or lease to private persons or corporations real estate other than the submerged lands reclaimed by it, whether improved or unimproved, whenever it shall find such real estate is or has become unnecessary for park, recreational or harbor development purposes for the benefit of the public, and to convey to the grantee the fee simple title to such real estate; said commission shall have the power to lease the submerged lands reclaimed by it for a period not exceeding ninety-nine (99) years upon such terms and provisions and for such considerations as it may determine. After any of such lands have been developed, if the commission finds by resolution spread on its minutes that it is impractical to lease the same and that it is more advantageous to the public interest to sell such lands, the commission shall have the power to sell the same in fee simple. Prior to the conveyance or lease of any such real estate, the commission shall, by resolution spread upon its minutes, find, determine and adjudicate that the property so to be conveyed or leased is or has become necessary for park, recreational or harbor development purposes for the benefit of the public;

"(g) The commission shall have the power to fix and collect rates, fees, charges, and tolls for the use of any bridge, tunnel or causeway constructed and operated by it and for the use of any service or facility provided by it; and

"(h) The commission shall have power to appoint and employ such officers, agents, attorneys and employees as the commission may find to be necessary to perform the services required and authorized under this Act, and to prescribe the duties and compensation of all such persons."

Section 5 provides for the handling of the revenues and monies received by the Commission.

Section 6 authorizes the Commission to borrow money and to issue bonds payable solely from income and revenues derived from the operation of the facilities acquired, owned and operated by the Commission, including rates, fees, and tolls charged for the use of any bridge, revenues from concessionaires and lessees; and from the sale, or lease of real estate. It further provides that any bonds so issued shall in no event become an obligation of the City of Biloxi.

The Act provides for the incorporation of said island or islands into the municipality of Biloxi as provided by statute. It provides that if any provision of the Act shall be adjudged invalid, such judgment shall not affect, impair, or invalidate the remainder of the Act. Other provisions of the Act not mentioned are not pertinent to the inquiry.

The Biloxi Bridge and Park Commission was established pursuant to the Act.

The island which is the subject of the proposed development is Deer Island, lying a short distance south of the penninsula on which the City of Biloxi is situated. Deer Island is about six miles long, running generally east and west, and contains 500 or 600 acres of land, ninety percent of which is owned by Aponaug and the remainder by private persons. A part of the island is covered by trees and a small portion is about 16 feet above sea level; the remainder is low and some parts are marshy. The waters surrounding the greater part of this island are shallow, being only a few feet deep extending out for a considerable distance.

On July 22, 1958, the Commission entered into a contract with Aponaug, the pertinent provisions of which are as follows:

Paragraph 1 provides that the Commission is authorized and empowered to acquire by grant, purchase or

otherwise an island or islands situated in the Mississippi Sound and to construct a bridge or causeway connecting the island with the mainland, and to construct wharfs, piers, jetties, shore protection and other public works, and aids to navigation, and to improve said island and to fill in submerged lands adjacent thereto.

Paragraph 2 states that it is to the best interest of the people and the City of Biloxi, the County of Harrison, and the State of Mississippi, that the navigable waters between the City of Biloxi and Deer Island and the waters around and adjacent to such island be improved and developed, including the construction of various facilities.

Paragraph 3 provides that in order to obtain funds necessary for such work the Commission desires to acquire in severalty fee simple title to seventy percent of Deer Island, and that the funds for the improvement and developments contemplated can only be obtained by entering into a plan of development of Deer Island whereby there will be constructed recreational facilities, walks. pathways, driveways, roadways, parks and other public works and that lots be sold or leased by the commission to the public for residential or commercial uses and the funds received therefrom to be used to pay such bonds, and to pay for such improvements and developments.

Paragraph 4 recites that navigation will be aided by the proposed development.

Paragraph 5 recites the necessity of connecting Deer Island to the mainland.

Paragraph 6 provides that Aponaug is the owner in fee simple of most of said Deer Island and of the riparian or littoral rights appurtenant thereto and that Aponaug is ready and willing to convey to the Commission in severalty seventy percent of that portion of Deer Island owned by it upon the conditions and consideration to be mentioned.

Paragraph 7 declares that the parties shall act separately and individually and the contract shall not constitute a joint venture or partnership.

Paragraph 8 provides that the Commission agrees to employ a development firm experienced in island development for the purposes of (a) to survey the island and the submerged lands adjacent thereto which are susceptible of being reclaimed without excessive costs and to prepare a plat thereof; (b) to lay off in such surveys lands to be utilized for wharfs, piers, and other public improvements, business areas, including hotels and motels, and different types of residential lots; (c) to set up a plan for the development of Deer Island with a detailed budget for original development and construction, maintenance and operation. Said section also provides that all such records and information appearing in the report of such development firm shall be available to each of the parties who shall be entitled to use the same for all purposes and that if the development is not consummated, the cost of the survey shall be paid by Aponaug.

Paragraph 9 provides for the approval of the survey and report by the Commission and Aponaug, and if approved by both parties, Aponaug agrees to convey to the Commission for the consideration set forth in Paragraph 10 fee simple title in severalty to seventy percent of the lots and land thus surveyed upon that portion of Deer Island owned by it and not now submerged and quitclaim all its right and interest in and to the submerged lands to be reclaimed, and Aponaug agrees to join in the filing of a plat dedicating streets and public places shown thereon, and to convey to the Commission or to the City of Biloxi any interest Aponaug may own in the lands designated on the plat for public parks and other public works and facilities. Said section further provides that the plan of development set forth in said

survey will not be materially altered without the consent of the Commission and Aponaug.

Paragraph 10 provides that the considerations for the delivery by Aponaug of the deeds already mentioned shall be (a) payment of a cash sum equal to the original purchase price of said portion of Deer Island owned by Aponaug and all taxes paid thereon by Aponaug since that time (this amounts to a total of $210,000); (b) the delivery by the Commission to Aponaug of a lease for 99 years in severalty to thirty percent of the lots and land to be reclaimed from the submerged lands as shown by such survey to be for residential, commercial or industrial purposes; and (c) if said 99-year lease of said lands to Aponaug shall be declared invalid, then all property conveyed by Aponaug to the Commission shall revert to Aponaug, and if the deed from Aponaug to the Commission shall be held invalid, then the property leased to Aponaug shall revert to the Commission; and (d) the execution of a detailed agreement by the Commission to perform the public works set out in later paragraphs.

Paragraph 11 provides for the choice of the lots to be conveyed by Aponaug to the Commission and the lots which shall be leased by the Commission to Aponaug by mutual agreement, in the absence of which, division shall be made by arbitration. Said section also provides that upon the execution of said deed by Aponaug, it shall have no further right, title or interest in the lots conveyed other than the right of reverter, and upon execution of the lease by the Commission to Aponaug, the Commission shall have no further right, title or interest in and to the lots thus leased except the right of reverter; and there shall not be any joint ownership or tenancy in common of any of the property affected by this instrument.

Paragraph 12 provides for the issuance of bonds by the Commission, for the payment of which it will pledge

the net revenues received by the Commission from the causeway or bridge, wharfs, port facilities and other facilities operated by the Commission and any sums received by the Commission from the sale, lease or rental of real estate owned by it.

Paragraph 13 provides that it is expressly understood and agreed that the lots owned by Aponaug and those leased to it shall not be subject to any lien or claim of the holders of the revenue bonds issued by the Commission and that the construction of curbs, gutters, streets, sidewalks and water and sewer systems and all other public improvements shall be out of the proceeds of said revenue bonds and the proceeds of the sale of lots belonging to the Commission, and that no lien for public improvements shall be assessed against any of the lots or property upon said island during or as a result of the development thereof; provided that if the City of Biloxi should construct any such public works or improvements and assess a lien upon the lots, as to those owned by Aponaug or its grantees in severalty, the Commission shall pay the assessment thus made in a lump sum from the funds received by it from the proceeds of such bonds and the revenue received by the Commission from the facilities constructed from such proceeds.

In Paragraph 14 the Commission agrees to use the proceeds of said revenue bonds and construct in accordance with the provisions of the engineering survey (a) a causeway or bridge connecting Deer Island to the mainland; (b) raising and reclaiming to a level normally safe for residential and commercial use such of the submerged lands contiguous to Deer Island as may be reasonably feasible; (c) in cooperation with the City of Biloxi to construct curbs, gutters, sewer system, water system, roads and streets so that no portion of the expense shall be assessed against the lots on said island; (d) in cooperation with the Biloxi Port Commission or

other public authority, to construct adequate inner harbor development on the north side of Deer Island, and dockage facilities and the deepening and improving of the channel north of said island.

Paragraph 15 provides for arbitration for the division of lots if said division cannot be mutually agreed upon by the Commission and Aponaug.

Paragraph 16 provides that said island may be incorporated into the City of Biloxi in accordance with law.

Paragraph 17 provides that Aponaug shall retain all oil and gas and other minerals in, on or under the lands presently owned by Aponaug, and that Aponaug shall not own or have any interest in the minerals under submerged lands to be reclaimed, and that all lands allotted for public purposes within the area now owned by Aponaug, Aponaug shall retain one-half interest therein and the Commission shall own a one-half interest therein.

Paragraph 18 provides that the Commission shall employ a development company of adequate experience, and Aponaug shall have a right to list with said company lots owned by or leased to it, and the sale of such lots shall be handled without cost to Aponaug, and that in the sale by such development company lots shall be sold on a proportionate basis comparable to the quantity owned by the Commission and those owned by Aponaug, and that the Commission shall not under sell Aponaug, but the prices as to both parties shall be kept at a fair valuation or market price.

Paragraph 19 provides for the zoning of the island in cooperation with the County of Harrison.

Paragraph 20 provides for the acquisition by the Commission of other lands lying on Deer Island not owned by Aponaug, the cost to be paid from the proceeds of the revenue bonds, and that such other lands so acquired shall be utilized for public purposes only.

Paragraph 21 provides that the whole plan of development is conditioned upon the following: (a) Obtaining an approval of the survey and report as provided for in Paragraph 7; (b) obtaining title to the remainder of Deer Island not now owned by Aponaug; (c) the validation and sale of sufficient bonds by the Commission; and either party may declare the contract terminated unless (1) the said survey and report is submitted and approved by Aponaug and the Commission prior to October 1, 1958, and (2) litigation to test the validity of this contract is filed within a certain date and title or option obtained upon the remainder of Deer Island within ninety days after termination of such litigation, and (3) the validation of the revenue bonds is consummated within 90 days after the fulfillment of all of the last named conditions.

Paragraph 23 provides for the execution and delivery from time to time of any and all instruments which may be reasonably necessary or proper to effectuate the purposes of the agreement.

Pursuant to the Act and the foregoing agreement, the Commission employed Rader and Associates of Miami, Florida, an outstanding island development, engineering and architectural firm, and preliminary reports and surveys by Rader and Associates have been presented to the parties.

It is either undisputed in this record or the chancellor was amply justified in finding certain general facts pertinent to the inquiry. The City of Biloxi is a densely populated municipality located on a penninsula bordered on three sides by Biloxi Bay and the Mississippi Sound. It is very overcrowded, and is in urgent need of physical space for expansion. Its economy is based on government payrolls at Keesler Field, the tourist trade, and the seafood industry. There is no area for the expansion of the city except the development of Deer Island. The City of Biloxi is losing approximately $8,000,000 in tour-

ist dollars each year because of lack of facilities to ac-
commodate tourists. Deer Island lies approximately one-
fourth mile from the City. The Mississippi Sound be-
tween the City and Deer Island accommodates a channel
of the present depth of ten feet to accommodate naviga-
tion in the area. The depth of the waters on the sub-
merged land proposed to be reclaimed in the develop-
ment program does not exceed about four or five feet
and the reclaiming of the lands under the proposed pro-
ject would increase the size of Deer Island to about 3300
acres. Thus, about 2700 or 2800 acres of submerged
lands would be reclaimed. The development of Deer Is-
land would cost, according to the surveys of Rader and
Associates, approximately $31,000,000, and, (according
to Aponaug's answer) the lots to be developed for sale
or lease for residential and commercial purposes would
have a sale value of approximately $43,000,000 (seventy
percent of which lots would be alloted to the Commis-
sion and thirty percent to Aponaug). No money raised
from general taxation would be used in the construction
and development of the island, but the property would
be subject to advalorem taxes when sold or leased to
private individuals. The proof was ample to show that
the project is feasible from an engineering and economic
standpoint, and the testimony showed that it has more
favorable possibilities than other similar and successful
developments in Florida, Georgia and other States. The
chancellor found upon ample evidence that the develop-
ment of this project is of public interest and would be
to the best interest of the public locally and generally,
and that the project would not be feasible without re-
claiming the submerged lands surrounding the island.

Appellants contend that if the plan for the develop-
ment of Deer Island is carried out under the terms of
the agreement between the Commission and Aponaug, it
will be in violation of Section 183, Mississippi Constitu-
tion of 1890, which Section is as follows:

"No county, city, town, or other municipal corporation shall hereafter become a subscriber to the capital stock of any railroad or other corporation or association, or make appropriation, or loan its credit in aid of such corporation or association. All authority heretofore conferred for any of the purposes aforesaid by the legislature or by the charter of any corporation, is hereby repealed. Nothing in this section contained shall affect the right of any such corporation, municipality, or county to make such subscription where the same has been authorized under laws existing at the time of the adoption of this Constitution, and by a vote of the people thereof, had prior to its adoption, and where the terms of submission and subscription have been or shall be complied with, or to prevent the issue of renewal bonds, or the use of such other means as are or may be prescribed by law for the payment or liquidation of such subscription, or of any existing indebtedness."

It is argued that the contract constitutes a joint venture between the Commission, an agency of the City of Biloxi, and Aponaug, a private corporation, and that such joint undertaking is invalid as being a loan of municipal credit to the private corporation.

The material facts bearing on this question are these: The contract calls for Aponaug to contribute to the project or venture seventy percent of the existing island and all its riparian or littoral rights. Aponaug must approve the overrall plan of development and no material changes may thereafter be made without mutual consent of the parties. The Commission is required to raise the funds to be used in developing the present island and the submerged lands by issuing revenue bonds. The commercial and residential lots are to be divided thirty percent to Aponaug and seventy percent to the Commission. The Commission must employ a development firm to sell the lots owned by the Commission, and Aponaug's lots are to be sold without cost to Aponaug,

if it lists them with the development firm. Lots of the Commission and of Aponaug must be sold on a proportionate basis comparable to the quantity owned by each. Neither party may undersell the other as to price.

In 37 Am. Jur., Municipal Corporations, Section 135, page 751, it is said: "It is generally held, however, that a contract whereby a municipal corporation engages jointly with a private individual or corporation in the construction of an improvement for joint use is invalid as being a loan of the municipal credit for private benefit."

Although many states have constitutional provisions similar to Section 183, there does not appear to have been any great amount of litigation on the subject.

In a case involving a similar provision in the Ohio Constitution, the Ohio Court said in Wyscaver v. Atkinson, 37 Ohio St. 80, that, "The mischief which this section interdicts is a business partnership between a municipality or subdivision of the state and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever. . . . . And I will add that it makes no difference whether the scheme for the union of public and private money or credit originates with the party or parties representing the public or the private interests. In short, the thing prohibited is the combination in any form whatever of the public funds or credit of any county, city, town, or township with the capital of any other person, whether corporated or unincorporated, for the purpose of promoting any enterprise whatever."

In Alter v. City of Cincinnati, 56 Ohio St. 47, 46 N. E. 69, the Supreme Court of Ohio said that the municipality must be the sole owner and controller of the property in which it invests its public funds. Similar holdings were announced in the cases of Lord v. City of Denver (Colo.), 143 P. 284, and Atkinson v. Board of Commissioners of Ada County, 18 Idaho 282, 108 P. 1046.

Notwithstanding the fact that the contract in question disclaims a joint venture between the Commission and Aponaug, the contract does in fact constitute a joint enterprise whereby the public agency contributes land and capital and Aponaug land. The resulting residential and commercial lots are to be divided in severalty, thirty percent to Aponaug, and seventy percent to the Commission. The fact that there will be no tenancy in common in lands is wholly immaterial. The funds raised from the bond issue are to be used to develop lands of a private corporation. The facts of this case are not comparable to the situation in Winona v. Albritton, 181 Miss. 75, 178 So. 799. We do not find the Florida cases cited by appellee in point. In none of those cases were the public funds used to improve private property.

██ █ We hold that the contract between the Commission and Aponaug is void.

Appellants contend that the Act violates subsections (g), (1), (q), (r), and (u) of Section 90 of the Mississippi Constitution of 1890. It is not necessary to discuss but one of these subsections of Section 90—subsection (u).

Section 90, Mississippi Constitution of 1890, provides in part as follows: ''The legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws, viz: . . . . .

''(u) Granting any lands under control of the state to any person or corporation.''

The immediate question involves three points of inquiry: (1) Are submerged lands, mentioned in the Act, adjacent to the islands of the sea under the control of the State? (2) Does the Act authorize the ''granting'' of any such land to any private persons or corporations? (3) Is the Act a general law?

██ █ The Act clearly shows that the ''submerged'' lands therein referred to are lands over which the tides

of the sea ebb and flow. By an unbroken line of decisions spanning a hundred years, this Court has declared the law to be that the State is the owner of the lands in the beds of all its shores, inlets, and adjacent to the islands, over which the tides of the sea ebb and flow, and that it holds title as trustee for the people of the State. Martin v. O'Brien, 34 Miss. 21; Money v. Wood, 152 Miss. 17, 118 So. 357; Rouse v. Saucier, 166 Miss. 704, 146 So. 291; State v. Stewart, 184 Miss. 202, 184 So. 44; Crary v. State Highway Commission, 219 Miss. 284, 68 So. 2d 468; Xidis v. City of Gulfport, 221 Miss. 79, 72 So. 2d 153.

Under Section 4 of the Act, the Commission is authorized and empowered to lease the submerged lands reclaimed by it for periods not exceeding 99 years, or, if the Commission finds it advantageous to the public interest to sell such lands, the Commission shall have the power to sell the same in fee simple. Whether the Commission leases the submerged lands or conveys the fee simple title, it would constitute the granting of the lands within the meaning of subsection (u). The word "grant" is a generic term applicable to all conveyances of real property whereby an estate in the lands is vested in the grantee, whether for years or in fee. Therefore, the Act authorizes the granting of the submerged lands to any person or corporation, within the meaning of the constitution.

The Act in question is designated a Local and Private Law. It was published as such, both the original 1955 Act and the amending Act in 1958. It was not printed in the General Laws for said years. It is, by express terms, limited to one municipality. Appellees contend that it is a Local and Public Law, and cite Haas v. Hancock County, 183 Miss. 365, 184 So. 812. In that case the Court said that a public law may be a general, local or special law. The granting of lands under the control of the State must be by general law.

If it is local, or private, or special, it is not general. The Act in question is not a general law. 50 Am. Jur., Statutes, Secs. 5 to 9.

For the idea underlying subsection (u), Section 90, when read with Section 95, Constitution of 1890, see Winton v. Day, 96 Miss. 1, 49 So. 264.

Appellees cite Xidis v. City of Gulfport, 221 Miss. 79, 72 So. 2d 173, but that case is not in point. In that case, the Court did not define the extent or limits of the authority of the City and the Gulfport Port Commission to lease reclaimed lands for commercial purposes. It expressly refrained from doing so. It should be noted that Chapter 743, Local and Private Laws of 1948, under which the City of Gulfport issued the bonds involved in that case, provided that the funds thus raised were to be used and the improvements made under the provisions of Chapter 2, Volume 6, Code 1942, a general law. This general law provides for the leasing for not exceeding 99 years of reclaimed submerged lands under the conditions therein provided.

The recent case of Culley v. Pearl River Industrial Commission, 108 So. 2d 390, cited by appellees as being generally applicable, has no bearing on the question under discussion.

The provision of the Act authorizing the sale or lease of reclaimed submerged lands is unconstitutional and void under Section 90, Subsection (u), Constitution of 1890.

Under the plain mandates of the Constitution of Mississippi we must reverse this case. However, this Court is keenly aware of the public interest involved and the desirability of developing the island. This decision does not mean that this Court will not look upon any future plan for developing Deer Island with as much favor as the Constitution and laws of the State permit.

Any discussion of other questions involved in the present controversy would be academic.

For the reasons stated herein the cause is reversed and remanded to the lower court for a proper decree directing the issuance of. an injunction enjoining the carrying out of the contract between the Commission and Aponaug.

Reversed and remanded.

All Justices concur.

ON SUGGESTION OF ERROR

McGEHEE, C. J.

We have carefully studied and considered the suggestion of error and the brief in support thereof in this case and we have concluded to adhere to our opinion rendered in this cause on June 8, 1959, and our conclusion in this behalf is strengthened by the views of the Supreme Court of Florida in the case of City of West Palm Beach, Florida v. State of Florida, etc., et al, case No. 29,743, wherein the opinion was filed by that Court on June 24, 1959, not yet reported. That case likewise involved the proposed issuance of revenue bonds instead of full faith and credit bonds to finance the project there involved.

Suggestion of error overruled.

All justices concur.