361 So.2d 44 (1978)
In re VALIDATION OF $15,000,000 HOSPITAL REVENUE BONDS (METHODIST HOSPITAL PROJECT) SERIES 1978, CITY OF HATTIESBURG, FORREST AND LAMAR COUNTIES, Mississippi, DATED APRIL 1, 1978.
Jo Ann C. KERLEY et al.
v.
CITY OF HATTIESBURG.
No. 50873.
Supreme Court of Mississippi.
June 14, 1978.
Rehearing Denied July 12, 1978.
*45 Larry O. Norris, Hattiesburg, for appellants.
Samuel E. Farris, Gray, Montague, Jackson & Pittman, Frank D. Montague, Jr., Hattiesburg, for appellee.
BEFORE SMITH, WALKER and COFER, JJ.
SMITH, Presiding Justice, for the Court:
Jo Ann C. Kerley and others, citizens and taxpayers of the City of Hattiesburg, Forrest and Lamar Counties, have appealed from a decree of the Chancery Court of Forrest County validating $15,000,000 in hospital revenue bonds ordered issued and sold by the City of Hattiesburg under resolution adopted by its governing body on September 28, 1977.
At its regular 1977 session, the Mississippi Legislature enacted into law House Bill 1232, which appears as Chapter 947, Local and Private Laws of Mississippi of 1977. A copy of the Act is appended as part of this opinion. Under the provisions of the Act, the City of Hattiesburg was authorized and empowered to issue its bonds to provide funds for the purpose of acquiring hospital facilities, the entire principal and interest, as well as all of the expenses of the issuance, sale and validation of the bonds, to be paid exclusively from revenues to be derived from a lease of the facilities thus acquired to a non-profit corporation.
On September 28, 1977, the Mayor and Commissioners of the City of Hattiesburg adopted an order or resolution declaring its intention to proceed under the Act and to issue and sell the bonds provided for therein in the principal sum of $15,000,000, provided the issuance of such bonds should be approved by a majority of the qualified electors of the municipality in a special election to be called and held for the purpose of submitting the matter to them.
The Act, as well as the September 28, 1977 order or resolution of the governing body of the municipality, specifically provided that payment of the principal, interest and expenses of the issue should be made solely and exclusively from revenues to be derived from the lease of the facilities to a non-profit corporation. The full faith, credit and resources of the city were not pledged to the payment thereof and this was stated in the resolution. In its September 28, 1977 order the Board called a special election for submission to the qualified electors of the municipality the question of whether or not said bonds should be issued, *46 said election to be held in each of the precincts of the municipality, the portions of the notice, as set out in the resolution and as later published and pertinent to the questions raised on this appeal, having been as follows:
NOTICE OF SPECIAL BOND ELECTION
CITY OF HATTIESBURG, MISSISSIPPI
NOTICE is hereby given to the qualified electors of the City of Hattiesburg, Mississippi, that a special election will be held in said City on Tuesday, November 8th, 1977, at which time there will be submitted to the qualified electors of said City the following proposition:
PROPOSITION
Shall the City of Hattiesburg, Mississippi, issue its hospital revenue bonds in the maximum principal amount of $15,000,000 to provide funds for acquiring a site and constructing, equipping and furnishing hospital facilities thereon to be leased to the Methodist Hospital of the Mississippi Annual Conference, a non-profit corporation, which bonds shall be limited obligations of the City, the principal of, redemption premium, if any, and interest on which shall be payable solely from revenues of said hospital facilities and from such other funds as may be made available from such corporation?
The said election shall be held at the following polling places within the said City of Hattiesburg, Mississippi, to-wit: [Here followed a list of all precincts]. The said polling places will be open from the hour of 7:00 A.M. until the hour of 6:00 P.M. on the day of said election. All qualified electors of said City may vote at said election.
The proposition shall be deemed to have been assented to if, and only if, a majority of the qualified electors who vote in such election shall vote in favor of the issuance of such bonds.
By order of the Board of Mayor and Commissioners of the City of Hattiesburg, Mississippi, this the 28th day of September, A.D., 1977.
The special election was duly held on November 8, 1977 and the foregoing proposition was submitted to the voters in each of the precincts of the City of Hattiesburg with the following result: for the proposition 3,590, against the proposition 2,350. The governing body of the municipality thereupon adopted a resolution declaring that the proposition had carried and had been approved by a majority of the qualified electors of the City of Hattiesburg in an election duly called and conducted in the manner provided by law.
A transcript of the proceedings was submitted to the State's Bond Attorney who examined the same, found and certified to the legal sufficiency thereof and rendered his opinion in writing, addressed to the governing board of the municipality, that the proposed bonds were legal, valid and binding according to their terms and tenor, and said written opinion to that effect was duly transmitted with all legal papers to the Clerk of the Chancery Court of Forrest County, and proceedings for their validation were begun in accordance with Mississippi Code Annotated section 31-13-5 et seq. (1972).
The matter was duly set for hearing and notice thereof was given in the manner required by law, and appellants herein, citizens and taxpayers of the City of Hattiesburg, filed their objections to the bond issue and to the validation thereof. The Chancery Court of Forrest County, following a hearing, entered its decree validating the bonds, and it is from this decree that the present appeal has been prosecuted. The material facts in the case have been stipulated by the parties.

OBJECTION NO. 1:
It is first objected that House Bill 1232, the Local and Private Act under which the City of Hattiesburg proposed to issue the bonds, violates Mississippi Constitution Article 4, Section 87 (1890).
According to the stipulation appearing in the record, the City of Hattiesburg entered into an agreement with the Methodist Hospital *47 of the Mississippi Annual Conference, a non-profit corporation, under the terms of which the hospital facilities to be acquired with the proceeds of the proposed bonds shall be leased to it, the lease containing a provision that title to the property, when the entire principal, interest and all other expenses shall have been paid in full by lessee, shall be transferred to lessee for a nominal sum in accordance with the provisions of the Act.
It is argued that the Act is violative of Article 4, Section 87 of the Mississippi Constitution of 1890 in that it suspends a general law which appears as section 41-13-1, et seq. Mississippi Code Annotated (1972). The cited chapter provides a method in which municipalities may acquire and own hospitals.
Article 4, Section 87 of the Mississippi Constitution of 1890 provides:
No special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by general law, or where the relief sought can be given by any court of this state; nor shall the operation of any general law be suspended by the legislature for the benefit of any individual or private corporation or association, and in all cases where a general law can be made applicable, and would be advantageous, no special law shall be enacted.
The pertinent part of Mississippi Code Annotated, section 41-13-17 (1972), is as follows:
Any political subdivision or subdivisions acting independently or jointly under the provisions of sections 41-13-15 to 41-13-51, may cooperate with a non-profit corporation either in the construction or operation of such facilities as are provided for in section 41-13-15, and may contract with said non-profit corporation for the operation of any hospital or any diagnostic or treatment center facilities constructed under the provisions of sections 41-13-15 to 41-13-51.
Any such political subdivision or subdivisions may, in its or their discretion, execute a lease of any such hospital or any such diagnostic or treatment center facilities to a qualified non-profit corporation for a term not exceeding fifty years....
Mississippi Code Annotated section 41-13-23 (Supp. 1977), is also cited, providing:
(2) All bonds, notes or other evidences of indebtedness issued under section 41-13-19 may be secured by a pledge of all or a specified portion of the annual general or special revenues of the facility for which the same were issued to acquire, construct, expand, equip or furnish, or by a pledge of any unrestricted unencumbered income from an endowment or other trust funds available to the Board of Trustees of the facility for which the same were issued to acquire, construct, expand, equip or furnish. The security for such bonds, notes or other evidences of indebtedness authorized and provided for by this subsection may be in addition to or in lieu of the pledge of the full faith, credit, and resources of the issuing entity as provided in subsection (1) hereof.
The issue on this particular point is whether the Local and Private Act "suspends" the general law. If the Act does indeed suspend the general law it offends Section 87 of the Constitution. If it does not "suspend" the general law, Section 89 of the Mississippi Constitution applies.
There shall be appointed in each house of the Legislature a standing committee on local and private legislation; the House Committee to consist of seven [7] representatives, and the Senate Committee of five [5] senators. No local or private bill shall be passed by either House until it shall have been referred to said committee thereof, and shall have been reported back with a recommendation in writing that it do pass, stating affirmatively the reasons therefor, and why the end to be accomplished should not be reached by a general law, or by a proceeding in court; or if the recommendation of the committee be that the bill do not pass, then it shall not pass the House to which it is so reported unless it be *48 voted for by a majority of all members elected thereto. If a bill is passed in conformity to the requirements hereof, other than such as are prohibited in the next section, the court shall not, because of its local, special, or private nature, refuse to enforce it.
In Yazoo & M.V.R. Co. v. Southern Railway Company in Mississippi, 83 Miss. 746, 773, 36 So. 74, 79 (1904), this Court held:
The last clause of section 89 prohibits the courts from annulling an act of the legislature passed in conformity to that section (other than certain excepted cases) because of its local, special or private nature, but there is no restriction on the courts as to an act to suspend the operation of a general law for the benefit of an individual or private corporation or association. That is left to condemnation because of its unconditional prohibition by the second clause of section 87.
There is no contention that the Act was not passed in accordance with the guidelines set out in section 89. In Haas v. Hancock County, 183 Miss. 365, 374, 184 So. 812, 813 (1938), it was said:
The argument that it devolved upon the county to show a compliance with the provisions of section 89 of the Constitution on the part of the legislature is ruled against by the opinion in the case of State ex rel. v. Jackson, 119 Miss. 727, 81 So. 1, where it was held that the court would not look to the journals of the legislature to see whether the legislature had complied with the provisions of section 89 of the Constitution in the passage of a local, private or special law. The Court there decided that it would not consider the journals, and would not undertake to review legislative proceedings, when they had been certified by the speaker of the house and the presiding officer of the senate, as having been passed in accordance with the Constitution, or to have been duly and properly passed.
If the Act does not operate to "suspend" the general law, then under the provisions of Section 89 of the Constitution it was a matter for the Legislature and this Court will enforce the legislative mandate of Mississippi Constitution, Article 4, Section 89 (1890).
In Feemster v. City of Tupelo, 121 Miss. 733, 743, 83 So. 804, 806 (1920), this Court upheld a statute authorizing the City of Tupelo to issue bonds for the purpose of constructing and equipping a municipal hospital. There, the Court stated:
We think the purpose of section 87 was to prevent local and special laws for such corporations as were not public in their nature. The Legislature has usually exercised full control over municipal corporations; the functions of both a municipal corporation and the Legislature being entirely public in their nature. The question here presented seems to turn, however, on the second or latter part of section 87, prohibiting the suspension by the Legislature of any general law for the benefit of an individual or a private corporation. The effect of Chapter 290 may be to suspend the general law contained in Chapter 147, Laws of 1914 (section 5968, Hemmingway's Code) but the prohibition applies to private and not municipal corporations. This construction, that the statute is constitutional, so far as the present controversy is concerned, is strengthened by section 89 of the Constitution, which provides for a committee of each house on local and private legislation, and provides that all local and private bills shall be referred to such committee and "reported back with the recommendation in writing that it do pass, stating affirmatively the reasons therefor, and why the end to be accomplished should not be reached by a general law, or by a proceeding in court," etc., the concluding clause of which section provides:
"If a bill is passed in conformity to the requirements hereof, other than such as are prohibited in the next section, the court shall not, because of its local, special, or private nature, refuse to enforce it."

*49 Whatever mischief may lie in the passing of special bills or laws of the kind here involved (and it may be conceded that such acts are not wholesome as a rule), the Constitution in the section last quoted vests in the Legislature, and not the court, the function of deciding this question, and we cannot refuse to enforce any law because merely in our judgment a general law would be better than a special one. The legislature has been recognized by the Constitution makers as being the best equipped to deal with the wisdom of enacting special laws rather than general laws, except in cases specifically provided for in the Constitution. We think the Act is not in conflict with Section 87 in such sense as to make it void and unenforceable in the courts.
Mississippi Code Annotated, section 41-13-1 et seq., (1972) had not been enacted when Feemster was decided and appellants contend that Feemster was a forerunner of the community hospital concept now provided for in its general statutes.
To determine whether the Act operates to suspend a general law Section 87 of the Constitution must be examined. As stated in Feemster:
The question here presented seems to turn, however, on the second or latter part of section 87, prohibiting the suspension by the Legislature of any general law for the benefit of an individual or a private corporation... . (121 Miss. at 743, 83 So. at 806).
The word "suspend" has been defined as follows:
To interrupt; to cause to cease for a time; to postpone; to stay, delay, or hinder; to discontinue temporarily, but with an expectation or purpose of resumption. [Black's Law Dictionary, (Revised 4th Ed. 1968)].
Section 1 of the present Act, House Bill 1232, states:
... [T]hat it is the purpose of this act to provide a measure of assistance and an alternative method to enable non-profit hospital institutions in the area to provide the facilities which are solely needed to accomplish the purposes of this act, all to the public benefit and good, as more fully provided herein. Local and Private Laws of the State of Mississippi, Chapter 947, Section 1, p. 95, (1977).
We have concluded that the Act provided to the City of Hattiesburg an alternative method of raising funds for the purpose of acquiring hospital facilities in that municipality. It is clear that the municipal government might have proceeded under the general law or, at its election, might have proceeded under the terms of the Local and Private Act.
The proposed hospital facilities will be available to the citizens of the municipality, and its primary function will be, of course, to serve the public.
In Craig v. North Mississippi Community Hospital, 206 Miss. 11, 39 So.2d 523 (1949), this Court stated:
Our conclusion is abundantly supported by the case of Albritton v. City of Winona, supra, from which we quote briefly:
"`The end being legitimate ... the means is for the Legislature to choose,' Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 876, 81 L.Ed. 1245, 109 A.L.R. 1327, the only limitation thereon under due process being that the means chosen must not be so far beyond the necessity of the case as to be an arbitrary exercise of governmental power.... Growth is the life of the law, and when it ceases to grow and keep pace with social and economic needs it becomes a hindrance instead of an aid to the public welfare... . `If the end be public, it matters not that it is attained through a private channel.' Hares American Constitutional Law, p. 286." (206 Miss. at 40-41, 39 So.2d at 529).
The Act does not violate Mississippi Constitution, Article 4, Section 87 (1890).

OBJECTION NO. 2:
Appellant next contends that the Act violates Mississippi Constitution, Article 7, Section 183 (1890), which reads as follows:

*50 No county, city, town, or other municipal corporation shall hereafter become a subscriber to the capital stock of any railroad or other corporation or association, or make appropriation, or loan its credit in aid of such corporation or association... .
It is appellants' position that the action of a municipality in issuing revenue bonds for the purpose of acquiring hospital facilities leased to a non-profit corporation amounts to a loan of the City's credit to a private corporation, citing Giles v. City of Biloxi, 237 Miss. 65, 112 So.2d 815 (1959). In Giles this Court said:
Where contract between corporation and City Bridge and Park Commission call for corporation to contribute to project for development of island 70 percent of existing island and all of corporation's riparian or littoral rights, and corporation was given right to approve overall plan of development of island, and commission was required to raise funds to be used in developing island and submerged lands by issuing revenue bonds, and commercial and residential lots were to be divided 30 percent to corporation and 70 percent to commission, contract was void as being a loan of municipal credit to a private corporation in violation of the Constitution.
In Giles, the Court found that the City of Biloxi proposed to engage in a joint venture with a private corporation and that funds derived from the issuance of its bonds were to be used to develop an island and to reclaim submerged lands which were then to be divided into commercial and residential lots, which were to be owned 30 percent by the corporation and 70 percent by the municipal commission. The circumstances in Giles do not resemble those presented by the present case.
Responding to this contention by appellants, appellees cite Albritton v. Winona, 181 Miss. 75, 178 So. 799 (1938). in Albritton a statute authorized the issuance of general obligation bonds for industrial development. In upholding the statute, this Court stated:
In Carothers v. Town of Booneville, supra, an analysis of which we have hereinbefore set forth, the Court, in holding that the statute there under consideration violated section 183 of the Constitution, said this: "The act is one strictly in aid of a private corporation, and it is well settled in this state that taxes cannot be levied for private purposes... . It is manifest to us that the act is in violation of section 183 of the state constitution." The statute there did not require that the lease of the property should retain in the municipality power to enforce the use of the property by the lessee for the purposes sought to be accomplished by the leasing of the property. The statute here so requires, and we have hereinbefore set forth our reasons for holding that the taxes to be levied under it are for a legitimate public purpose. These leases here contemplated by the statute, therefore, are not within the condemnation of section 183 of the Constitution. (181 Miss. at 110-111, 178 So. at 809).
While no Mississippi case has been cited precisely on the point, the problem has been dealt with in other jurisdictions.
64 C.J.S. Municipal Corporations § 1909, (1950), deals with the question:
Municipal bonds cannot be lawfully issued as a donation to aid mills, factories, or any other private enterprise; nor can the Legislature authorize a municipal corporation to issue bonds in aid of a private manufacturing establishment, or to enable individuals, whose property has been burned, to rebuild; but, when authorized by statute, bonds may be issued in aid of works of internal improvement or the establishment of a university; and constitutional prohibitions against donations, or the loan of money or credit, by a municipality to, or in aid of, a corporation, association, or individual do not apply so as to forbid the issuance of bonds or other obligations payable exclusively from the revenues of the agency issuing them, or the issuance of municipal bonds for the purpose of repairing and restoring factory property, acquired by the municipality *51 under a tax deed, so that it can be sold or leased, or for the funding of the indebtedness of a former municipality which, by annexation, has become a part of the municipality issuing the bonds, or for the acquisition of land to be donated to the State or the United States, or for any improvement, facility, or project which is of a public nature, is for a public and municipal purpose, and will benefit the public generally, even though it will incidentally result in benefit to some individuals or private corporations.

See also Foster v. North Carolina Medical Care Commission, 283 N.C. 110, 195 S.E.2d 517 (1973); Baird v. City of Adairville, 426 S.W.2d 124 (Ky. 1968); In re Opinion of Justices, 256 Ala. 162, 53 So.2d 840 (1951); Hogue v. Housing Authority of North Little Rock, 201 Ark. 263, 144 S.W.2d 49 (1940).
Section 1 of the Local and Private Act, under which the City of Hattiesburg acted in the present case, provides:
It is hereby determined and declared that for the benefit of the people of the City of Hattiesburg, Forrest County, Lamar County and the surrounding area, the increase of their commerce, welfare and prosperity and the improvement and maintenance of their health and living conditions, it is essential that the people of the said area have access to adequate medical care and hospital facilities, and it is essential that nonprofit hospital institutions within said area be provided with appropriate additional means to assist in the improvement and maintenance of the public health; ...
The Act also provides:
All bonds issued by the City under authority of this Act shall be limited obligations of the City, the principal of, redemption premium, if any, and interest on which shall be payable solely from revenues of the project or projects financed with proceeds of bonds and from such other funds as may be made available to the City for such purpose by the hospital institution. Bonds and interest coupons issued under authority of this Act shall never constitute an indebtedness of the City within the meaning of any state constitutional provision or statutory limitation, and shall never constitute nor give rise to a pecuniary liability of the City or a charge against its general credit or taxing powers, and such facts shall be plainly stated on the face of each such bond... . (Section 12, Local and Private Act).
We have concluded that the action of the governing body of the City of Hattiesburg in the issuance of these bonds, payable entirely from revenues to be derived from the lease of the hospital facilities to be acquired with their proceeds, and to the payment of which the full faith, credit and resources of the City are in nowise obligated or pledged, does not constitute the making of an appropriation, or a lending of the public credit by the City of Hattiesburg to a private corporation in violation of Section 183 of the Mississippi Constitution.

OBJECTION NO. 3:
The notice to the electors did not sufficiently inform them of the purpose of the bond issue.
A copy of the notice of the election, as set out in the order or resolution of the governing authority of September 28, 1977, which was published for the time and in the manner required by law, has already been set out in this opinion. Appellants criticize the notice, saying that it was misleading and insufficient to apprise the taxpayers of the purpose of the bond issue. The essence of this argument is that it did not contain a specific statement that after the lessee had fully paid the principal, interest and expenses of the bond issue that, as provided in the Act and in the September 28, 1977 order or resolution, the property should then be transferred to lessee for a nominal sum.
The question is discussed in 15 McQuillin, Municipal Corporations, section 40.07 at page 239 (3d Ed. 1970), as follows:
The notice of election must state the purpose of the election, and must be definite and not misleading. However, of course, if a notice is as definite as it can be made, under the circumstances, or if it *52 contains a fair portrayal of the chief features of the proposition in words of plain meaning, it is sufficient. So, generally, it must state, in the case of bond elections, the purpose of the issue, the amount of the proposed issue, the rate of interest the bonds will bear, the maturity of the bonds, and the place of the election. But where the election is a general one, it has been held that the notice of election need not name the place of holding the election.
.....
While a taxpayers' suit may be maintained to test the validity of the election, in the absence of fraud, or attempt to mislead the voters, or express declaration in the law to the contrary, mere irregularities, which do not prevent a full and free expression of opinion of the will of the electors, and do not affect or change the result, will not invalidate the election. (Ibid. section 40.14 at p. 276).
.....
All presumptions are in favor of the validity of the election, and as said above, it will not be vitiated by mere irregularities. (Ibid. section 40.16 at p. 285).
This Court in Mississippi Power and Light Co. v. Town of Batesville, 187 Miss. 737, 193 So. 814 (1940), dealt with the subject, saying:
There is authority in other states, construing other statutes not like the one at bar, which holds to the effect that the governing body might not issue bonds for the purpose of constructing or erecting its electric light plant. But it is perfectly clear from this entire act that the only question required by the Legislature to be submitted to the voters was as to the purpose to acquire an electric light plant.
.....
In our opinion, it would defeat the purpose of this act if we were to hold that the governing authorities of a municipality or county would be required to say whether or not they would purchase an electric plant already constructed, or construct one of their own. The manifest purpose of the act was to give the governing authorities the power to do that which is determined to be best; and we think this is fully demonstrated by the use of the word "acquire" in the act, as well as the definition thereof. We think the resolution here fully expresses the purposes of the governing body of the town of Batesville, under the terms of the act. Nothing more was required. (187 Miss. at 750, 193 So. at 816).
In Spencer v. Mayor and Board of Aldermen of Yazoo City, 215 Miss. 160, 60 So.2d 562 (1952), this Court stated:
The proposition to be submitted to the qualified electors is to be stated "in general terms", and only "the maximum amount and the purposes of such bonds" need be stated in the resolution declaring the intention to issue the bonds and in the notice of the election. These requirements were met in the case that we now have before us. The resolution declaring the intention of the mayor and board of aldermen to issue the bonds, the notice of the election and the ballot used in the election plainly stated that the bonds proposed to be issued were electric system revenue bonds, that the maximum amount of bonds proposed to be issued was $1,700,000, and that the bonds were to be issued to raise funds for the purpose of improving the electric generating, transmission and distribution system of the city. We therefore hold that the notice was sufficient and that the proposal to issue the bonds was properly submitted to the qualified electors for their approval or disapproval. (215 Miss. at 174-175, 60 So.2d at 567-568).
We have concluded that the notice as published was not so inadequate or misleading as to be capable of deceiving the voters. The September 28, 1977 order or resolution adopted by the governing body of the municipality and referred to in the notice, fully set forth the terms of the lease, including the ultimate transfer of the facilities to the non-profit corporation when the entire bond issue, principal and interest, should have been fully paid by the lessee. A provision *53 for this eventuality is expressly made in the Act itself. We do not regard the failure to set this out in the notice of the election as having invalidated the result. The transfer contemplated will only be made when, as, and if the lessee shall have fully paid and retired every bond of the issue, with all interest, covering the entire cost of acquiring and constructing the facility. In other words, the transfer of title will occur when, and only when, there shall remain outstanding none of the bonds of the proposed issue.

OBJECTION NO. 4:
This objection involves a contention that House Bill 1232 is violative of the First Amendment of the United States Constitution and of Mississippi Constitution, Article 4, Section 66 (1890).
The First Amendment prohibits the establishment of religion and was held to be applicable to the states through the Fourteenth Amendment in Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).
In the case of Hunt v. McNair, 413 U.S. 734, 737, 93 S.Ct. 2868, 2871, 37 L.Ed.2d 923, 927 (1973), the United States Supreme Court approved the issuance by Charleston County South Carolina of revenue bonds in aid of the Baptist College at Charleston. In so holding, the high court stated:
While revenue bonds to be used in connection with a project are issued by the Authority, the Act is quite explicit that the bonds shall not be obligations of the state, directly or indirectly: ...
Moreover, since all the expenses of the Authority must be paid from the revenues of the various projects in which it participates, S.C.Code Annotated, § 2241.5 (Supp. 1971), none of the general revenues of South Carolina is used to support a project.
In the present case it is perfectly clear that the purposes of the Legislature in enacting the law under which the City of Hattiesburg is proceeding, and of the governing body of that municipality, were to provide a means for acquiring hospital facilities to be available to the public. There is nothing in the Act, and nothing in the resolution of the governing body of the municipality, that can be construed as being in aid of, or directed toward the "establishment of religion." Nor is there any merit in the contention that the issuance of the bonds violates Mississippi Constitution, Article 4, Section 66 (1890), which provides:
No law granting a donation or gratuity in favor of any person or object shall be enacted except by the concurrence of two-thirds of the members elect of each branch of the legislature, nor by any vote for a sectarian purpose or use.

Obviously, there is nothing in the issuance of the bonds or in the carrying out of the proposed project that can be construed as a donation or gratuity, since the entire cost of the project is to be paid by the lessee. The full faith, credit and resources of the City of Hattiesburg are neither pledged nor obligated nor can they be under the Act. Moreover, it is clear that there is nothing in the issuance of the bonds or in the carrying out of the proposed project which amounts to a donation or gratuity for a sectarian purpose or use.
In Craig v. Mercy Hospital-Street Memorial, 209 Miss. 427, 45 So.2d 809 (1950), this Court upheld a grant to a private non-profit Catholic hospital. In so holding, this Court stated:
Assuming that the appellee hospital is qualified as a non-profit institution, as found by the Commission on Hospital Care and by the trial court as an issue of fact, we have left for decision the second ground of defense of whether or not the grant of funds is a donation or gratuity for a sectarian purpose or use in violation of section 66 of the State Constitution. If there is no "donation or gratuity" involved in the instant case, then section 66 has no application at all. That is to say, unless there is a donation or gratuity, the problem as to whether or not the grant is "for a sectarian purpose or use" does not arise.
Our Constitution does not say "no appropriation", or "no public funds", or "no *54 money of the state" may be used "for a sectarian purpose or use", but the provision is that no "donation or gratuity" shall be made for such purpose... . (209 Miss. at 439, 45 So.2d at 814).

OBJECTION NO. 5:
The Act violates the spirit and letter of the National Health Planning and Development Act of 1974, 42 U.S.C. § 300k et seq.
This complaint relates, in the main, to the rejection of evidence touching the proposed location of the facility. It is argued that the effect of locating the proposed hospital in the western part of town, although within the city, is to deny to residents of other parts of town "equal access." It is the position of appellant that this violates the "spirit and letter" of the above federal statute. It is contended that the chancellor should have heard evidence on this point and that this is contemplated by Mississippi Code Annotated section 31-13-5 (1972), which provides:
... On the hearing the chancellor may hear additional competent, relevant and material evidence under the rules applicable to such evidence in the chancery court, so as to inquire into the validity of the bonds or other obligations proposed to be issued... .
However, the chancellor correctly declined to receive evidence touching collateral matters and properly restricted the evidence to such as was "competent, relevant and material" to the inquiry which was, of course, as to the "validity of the bonds."
In Board of Supervisors of Prentiss County for Booneville and Burton Good Roads Dist. v. Holley, et al., 141 Miss. 432, 441, 106 So. 644, 645 (1926), this Court stated:
It is true the statute provides that at the hearing of the objections of taxpayers the chancery court may admit additional evidence touching the validity of the bonds proposed to be issued. In other words, that the court is not confined in its inquiry alone to the record proceedings theretofore had providing for the issuance of the bonds, but may hear other evidence touching the validity of the bonds. The statute does not mean, however, that the chancery court is authorized to review in all respects the discretion and judgment of the municipal body issuing the bonds. It is only those orders and judgments which affect the validity of the bonds. As to all others the action of the issuing board or authority is final and conclusive. The question always under the statute is whether or not the proposed bonds are legal or illegal, as appears from the face of the proceedings and any additional testimony admitted by the court. The district for which the bonds are being issued may be unwisely and unjustly organized. The authority issuing the bonds may make errors and mistakes of judgment, and still the bonds may be valid. It is only such judgments, orders, and resolutions of the issuing authority which render the bonds invalid that the chancery court has the authority to overturn and set aside... . (141 Miss. at 441, 106 So. at 645).
The Court is indebted to counsel for both sides for the thorough briefing of the several issues presented on appeal. After a study of the record and a careful consideration of the authorities cited we have concluded that the chancellor was correct in entering the decree validating the bonds. We find that the Act under which the bonds are to be issued is not in violation of any provision of the United States or Mississippi Constitutions and authorizes the City of Hattiesburg to issue the bonds in the manner and form set forth in the Act and in the resolution adopted by the governing authority of the municipality on September 28, 1977, said bonds to be payable solely from the revenues to be derived under the lease of the facility to the non-profit corporation in keeping with the terms of the Act and the resolution of September 28, 1977. The decree appealed from is affirmed.
AFFIRMED.
PATTERSON, C.J., ROBERTSON, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.

*55 ADDENDUM

CHAPTER 947

HOUSE BILL NO. 1232
AN ACT to authorize the City of Hattiesburg, Mississippi, to acquire hospital facilities; to lease or sell such hospital facilities to a nonprofit corporation or to loan monies derived from bond proceeds to a nonprofit corporation for the construction of hospital facilities; to issue bonds, notes or other obligations, the principal of, redemption premium, if any, and interest on which is payable solely from revenues of the hospital facilities and other funds available to the nonprofit corporation; to provide for the terms and conditions under which such bonds, notes or other obligations may be issued; to provide for the security for such bonds, notes or other obligations; and for related purposes.
Be it enacted by the Legislature of the State of Mississippi:
Section 1. It is hereby determined and declared that for the benefit of the people of the City of Hattiesburg, Forrest County, Lamar County and the surrounding area, the increase of their commerce, welfare and prosperity and the improvement and maintenance of their health and living conditions, it is essential that the people of said area have access to adequate medical care and hospital facilities, and it is essential that nonprofit hospital institutions within said area be provided with appropriate additional means to assist in the improvement and maintenance of the public health; that it is the purpose of this act to provide a measure of assistance and an alternative method to enable nonprofit hospital institutions in the area to provide the facilities which are solely needed to accomplish the purposes of this act, all to the public benefit and good, as more fully provided herein. This act shall be liberally construed in conformity with such intention.
Section 2. Wherever used in this act, unless a different meaning clearly appears in the context, the following terms, whether used in the singular or plural, shall be given the following respective interpretations:
(a) "Bonds" shall mean bonds, notes or other obligations of the city issued pursuant to this act.
(b) "City" shall mean the City of Hattiesburg, Mississippi.
(c) "Contracting party" or "other contracting party" shall mean any party to a sale contract or loan agreement, except the city.
(d) "Enterprise" shall mean the health operations to be carried on with the facilities of a project.
(e) "Governing body" shall mean the Board of Mayor and Commissioners of the City of Hattiesburg, Mississippi.
(f) "Hospital institution" shall mean any nonprofit corporation or similar entity organized under the laws of the State of Mississippi and which is an organization described in Section 501(c)(3) or any successor section of the Internal Revenue Code of 1954, as amended.
(g) "Lease" includes a lease containing an option to purchase the project for a nominal sum upon payment in full, or provision therefor, of all bonds issued in connection with the project and all interest thereon, and all other expenses in connection with the project, and a lease containing an option to purchase the project at any time, as provided therein, upon payment of the purchase price which shall be sufficient to pay all bonds issued in connection with the project and all interest thereon and all other expenses incurred in connection with the project, but which payment may be made in the form of one or more notes, debentures, bonds or other secured or unsecured debt obligations of the lessee providing for timely payments, including, without limitation, interest thereon sufficient for such purposes and delivered to the city or to the trustee under the trust agreement pursuant to which the bonds were issued.
(h) "Loan agreement" shall mean an agreement providing for the city to loan the *56 proceeds derived from the issuance of bonds pursuant to this act to one or more contracting parties to be used to pay the cost of one or more projects and providing for the repayment of such loan by the other contracting party or parties, and which may provide for such loans to be secured or evidenced by one or more notes, debentures, bonds or other secured or unsecured debt obligations of the contracting party or parties, delivered to the city or to the trustee under the trust agreement pursuant to which the bonds were issued.
(i) "Project" shall mean a structure, facility, machinery, equipment and/or other property suitable for use by a hospital institution in connection with its operations or proposed operations, including, without limitation, a site therefor, a communication facility, computer facility, dining hall, extended care facility, fire fighting facility, fire prevention facility, food service and preparation facility, health care facility, hospital, interns' residence, laboratory, laundry, maintenance facility, nurses' residence, offices, parking areas and structures, pharmacy, recreational facility, research facility, storage facility, utilities, X-ray facility or any combination of the foregoing.
(j) "Sale contract" shall mean a contract providing for the sale of one or more projects to one or more contracting parties and includes a contract providing for payment of the purchase price in one or more installments. If the sale contract permits title to the project to pass to the other contracting party or parties prior to payment in full of the entire purchase price, it shall also provide for the other contracting party or parties to deliver to the city, or to the trustee under the trust agreement pursuant to which the bonds were issued, at or prior to the passage of such title one or more notes, debentures, bonds or other secured or unsecured debt obligations of such contracting party or parties providing for timely payments, including, without limitation, interest thereon for the balance of the purchase price.
Section 3. The city is hereby granted the following powers, together with all powers incidental thereto or necessary for the performance of those hereinafter stated, in order to effectuate the purposes of this act:
(a) To acquire, whether by purchase, construction, exchange, gift, lease or otherwise, and to improve, maintain, extend, equip and furnish one or more projects, which projects may be either within or without the corporate limits of the city, but shall not be more than five (5) miles from such corporate limits, including all real and personal properties which the governing body may deem necessary in connection therewith and regardless of whether or not any such projects shall then be in existence;
(b) To lease to a hospital institution one or more projects upon such terms and conditions as the governing body shall deem proper and to charge and collect rent therefor and to terminate any such lease upon the failure of the lessee to comply with any of the obligations thereof, and to include in any such lease, if desired, provisions that the lessee thereof shall have options to renew the term of the lease for such period or periods and at such rent as shall be determined by the governing body and/or to purchase any or all of the projects, or that upon payment of all of the indebtedness incurred under this act it may lease or convey any or all of the projects to the lessees thereof with or without consideration;
(c) To sell to a hospital institution one or more projects for such payments and upon such terms and conditions as the governing body may deem advisable in accordance with the provisions of sale contracts entered into pursuant to this act;
(d) To enter into loan agreements with a hospital institution with respect to one or more projects for such payments and upon such terms and conditions as the governing body may deem advisable in accordance with the provisions of this act;
(e) To borrow money and issue its bonds for the purpose of carrying out any of its powers under this act; and
(f) As security for the payment of the principal of, redemption premium, if any, *57 and interest on any bonds so issued and any agreements made in connection therewith, to mortgage and pledge any or all of the projects or any part or parts thereof, whether then owned or thereafter acquired, and to pledge the revenues and receipts therefrom, or from any one thereof, to assign and pledge all or any part of its interest in and rights under the leases, sale contracts or loan agreements relating thereto or to any one thereof, and/or to pledge all or any part of any grant, donation or income received or to be received from the United States Government or any other public or private source, including any revenues and receipts available to a hospital institution, whether pursuant to an agreement or otherwise.
The city shall not have the power to operate any project financed under this act as a business or in any manner except as specifically provided in this act. Any lease, sale contract or loan agreement with respect to a project entered into pursuant to the provisions of this act shall be for a term not shorter than the longest maturity of any bonds issued to finance such project and shall provide for revenues adequate to pay principal of, redemption premium, if any, and interest on such bonds as the same fall due, and to pay such portion of the expenses as may be incurred pursuant to the provisions of this act. Contracts for the acquisition, purchase, construction, improvement, equipping, furnishing, leasing and/or selling of a project need not be entered into upon the basis of public bidding, nor shall any other laws applicable to public contracts be applicable to any contracts entered into pursuant to this act.
Section 4. Bonds issued pursuant to the provisions of this act, exclusive of bonds issued to provide for the refunding of outstanding bonds, shall not exceed Sixteen Million Dollars ($16,000,000.00).
Section 5. The principal of, redemption premium, if any, and interest on the bonds shall be payable solely out of, and shall be secured by a pledge of the revenues and receipts derived from the projects, or of any one thereof as may be designated in the proceedings of the governing body under which the bonds shall be authorized to be issued, including debt obligations of the lessee or contracting party obtained from or in connection with the financing of a project, and from such other sources available to the lessee or contracting party as may be designated by the governing body in its proceedings in connection with the issuance of the bonds. Such bonds may be executed and delivered by the city at any time and from time to time, may be in such form and denominations and of such terms and maturities, may be in fully registered form or in bearer form registrable either as to principal or interest or both, may bear such conversion privileges and be payable in such installments and at such time or times not exceeding forty (40) years from the date thereof, may be payable at such place or places, whether within or without the State of Mississippi, may bear interest at such rate or rates, payable at such time or times, and at such place or places and evidenced in such manner, and may contain such provisions not inconsistent herewith, all as shall be provided in the proceedings of the governing body whereunder the bonds shall be authorized to be issued. If deemed advisable by the governing body, there may be retained in the proceedings under which any bonds are authorized to be issued an option to redeem all or any part thereof as may be specified in such proceedings, at such price or prices and after such notice or notices and on such terms and conditions as may be set forth in such proceedings and briefly recited or referred to in the face of the bonds, but nothing herein contained shall be construed to confer on the city any right or option to redeem any bonds, except as may be provided in the proceedings under which they shall be issued. Any bonds of the city may be sold at public or private sale for such price and in such manner and from time to time as may be determined by the governing body to be most advantageous, and the city may pay all expenses, premiums and commissions which its governing body may deem necessary or advantageous in connection with the issuance thereof, but solely from the proceeds of the *58 bonds. The issuance by the city of one or more series of bonds for one or more purposes shall not preclude it from issuing other bonds in connection with the same project or any other project, but the proceedings whereunder any subsequent bonds may be issued shall recognize and protect any prior pledge or mortgage made for any prior issue of bonds.
The proceeds of bonds may be used for the purpose of constructing, acquiring, reconstructing, improving, equipping, furnishing, bettering or extending any project or projects, including the payment of interest on the bonds during construction of any such project and for six (6) months after the estimated date of completion, the payment of engineering, fiscal, architectural and legal expenses incurred in connection with such project and the issuance of the bonds, the establishment of a reasonable reserve fund for the payment of principal of and interest on such bonds in the event of a deficiency in the revenues and receipts available for such payments, and the payment of start-up costs and costs of operation and maintenance of any such project during construction and for a maximum of one (1) year after completion of construction.
Section 6. (1) Any bonds of the city at any time outstanding may, at any time and from time to time, be refunded by the city by the issuance of its refunding bonds in such amount as the governing body may deem necessary, but not exceeding:
(a) The principal amount of the obligations being refinanced;
(b) Applicable redemption premiums thereon;
(c) Unpaid interest on such obligations to the date of delivery or exchange of the refunding bonds;
(d) In the event the proceeds from the sale of the refunding bonds are to be deposited in trust as hereinafter provided, interest to accrue on such obligations from the date of delivery to the date of maturity or to the first redemption date, whichever shall be earlier; and
(e) Expenses, premiums and commissions deemed by the governing body to be necessary in connection with the issuance of the refunding bonds.
(2) Any such refunding may be effected, whether the obligations to be refunded shall have then matured or shall thereafter mature, either by the exchange of the refunding bonds for the obligations to be refunded thereby with the consent of the holders of the obligations so to be refunded, or by sale of the refunding bonds and the application of the proceeds thereof to the payment of the obligations to be refunded thereby, and regardless of whether or not the obligations to be refunded were issued in connection with the same projects or separate projects, and regardless of whether or not the obligations proposed to be refunded shall be payable on the same date or different dates or shall be due serially or otherwise.
(3) The principal proceeds from the sale of any refunding bonds shall be applied only as follows:
(a) To the immediate payment and retirement of the obligations being refunded; or
(b) To the extent not required for the immediate payment of the obligations being refunded then such proceeds shall be deposited in trust to provide for the payment and retirement of the obligations being refunded and to pay any expenses incurred in connection with such refunding, but may also be used to pay interest on the refunding bonds prior to the retirement of the obligations being refunded. Money in any such trust fund may be invested in direct obligations of, or obligations the principal of and interest on which are guaranteed by, the United States Government, or obligations of any agency or instrumentality of the United States Government, or in certificates of deposit issued by a bank or trust company located in the State of Mississippi if such certificates shall be secured by a pledge of any of said obligations having an aggregate market value, exclusive of accrued interest, equal at least to the principal amount of the certificates so secured. Nothing herein shall be construed as a limitation *59 on the duration of any deposit in trust for the retirement of obligations being refunded but which shall not have matured and which shall not be presently redeemable.
Section 7. (1) The bonds may be secured by a trust agreement by and between the city and a corporate trustee, which may be any trust company or bank incorporated under the laws of the United States or the laws of any state in the United States. Any such trust agreement may pledge or assign lease income, contract payments, fees or any other revenues and receipts to be received from a hospital institution whether or not related to a project. The bonds may be additionally secured by a mortgage, deed of trust or other security interest upon a project vesting in the trustee power to sell such project for the payment of indebtedness, power to operate a project and all other powers and authority and for the further security of the bonds.
(2) The trust agreement may evidence a pledge of all or any part of the revenues to be derived from the project for the payment of the principal of, premium, if any, and interest on the bonds as the same shall become due and payable and may provide for the creation and maintenance of reserves. Any such trust agreement or any resolution providing for the issuance of bonds may contain such provisions for protecting and enforcing the rights and remedies of the holders thereof as may be reasonable and proper and not in violation of law, including the duties of the city and the hospital institution in relation to the acquisition of property and the construction, improvement, maintenance, repair, operation and insurance of the project for which such bonds shall have been issued, and the custody, safeguarding and application of all monies. Any such trust agreement may set forth the rights and remedies of the bondholders and of the trustee, and may restrict the individual right of action by bondholders as is customary in trust agreements or trust indentures securing bonds and debentures of corporations. In addition to the foregoing, any such trust agreement may contain such provisions as the city may deem reasonable and proper for the security of the bondholders and may also contain provisions governing the issuance of bonds to replace lost, stolen or mutilated bonds. All expenses incurred by the city in carrying out the provisions of such trust agreement may be treated as a part of the cost of the operation of the project with respect to which the bonds have been issued.
(3) Any trust agreement made in accordance with the provisions of this act may contain a provision that, in the event of a default in the payment of the principal of, redemption premium, if any, or the interest on the bonds issued in accordance with, or relating to, such agreement, or in the performance of any agreement contained in the proceedings, trust agreement or instruments relating to such bonds, such payment and performance may be enforced by mandamus or by the appointment of a receiver in equity with power to charge and collect rates, rents or contract payments and to apply the revenues from the project in accordance with such proceedings, trust agreement or instruments.
(4) Any mortgage or deed of trust to secure bonds issued in accordance with the provisions of this act may also provide that in the event of a default in the payment thereof or the violation of any agreement contained in the mortgage or deed of trust, the property secured by the mortgage or deed of trust may be foreclosed and sold under proceedings in equity or in any other manner now or hereafter permitted by law. Such mortgage or deed of trust may also provide that any trustee under such mortgage or deed of trust, or the holder of any of the bonds secured thereby, may become the purchaser at any foreclosure sale if it is the highest bidder therefor.
Section 8. Prior to the issuance of any bonds under the provisions of this act, the governing body shall adopt a resolution declaring its intention so to do, stating the amount of bonds proposed to be issued, the purpose for which the bonds are to be issued, and the date upon which the governing body proposes to direct the issuance of *60 such bonds. Such resolution shall be published once a week for at least three (3) consecutive weeks in at least one (1) newspaper published in the city. The first publication of such resolution shall be made not less than twenty-one (21) days prior to the date fixed in such resolution to direct the issuance of the bonds and the last publication shall be made not more than seven (7) days prior to such date. If fifteen hundred (1500) of the qualified electors of the city shall file a written protest against the issuance of such bonds on or before the date specified in such resolution, then an election on the question of the issuance of such bonds shall be called and held as herein provided. If no such protest be filed, then such bonds may be issued without an election on the question of the issuance thereof at any time within a period of two (2) years after the date specified in the above-mentioned resolution; provided, however, that the governing body, in its discretion, may nevertheless call an election on such question, in which event it shall not be necessary to publish the resolution declaring its intention to issue bonds as herein provided.
Section 9. Where an election is to be called as provided in Section 7 of this act, notice of such election shall be signed by the city clerk and shall be published once a week for at least three (3) consecutive weeks in at least one (1) newspaper published in the city. The first publication of such notice shall be made not less than twenty-one (21) days prior to the date fixed for such election and the last publication shall be made not more than seven (7) days prior to such date.
Section 10. Such election shall be held, as far as is practicable, in the same manner as other elections are held in municipalities. At such election, all qualified electors of the city may vote, and the ballots used at such election shall have printed thereon a brief statement of the amount and purpose of the proposed bond issue and the words "FOR THE BOND ISSUE" and "AGAINST THE BOND ISSUE," and the voter shall vote by placing a cross (x) or check mark (&check;) opposite his choice on the proposition.
Section 11. When the results of the election on the question of the issuance of such bonds shall have been canvassed by the election commissioners of the city and certified by them to the governing body, it shall be the duty of the governing body to determine and adjudicate whether or not a majority of the qualified electors who voted thereon in such election voted in favor of the issuance of such bonds, and unless a majority of the qualified electors who voted thereon in such election shall have voted in favor of the issuance of such bonds, then such bonds shall not be issued. Should a majority of the qualified electors who vote thereon in such election vote in favor of the issuance of such bonds, then the governing body may issue such bonds, either in whole or in part, within two (2) years after the later of the election date or the date on which there is a final favorable termination of any litigation affecting the issuance of such bonds.
Section 12. All bonds issued by the city under authority of this act shall be limited obligations of the city, the principal of, redemption premium, if any, and interest on which shall be payable solely from revenues of the project or projects financed with proceeds of bonds and from such other funds as may be made available to the city for such purpose by the hospital institution. Bonds and interest coupons issued under authority of this act shall never constitute an indebtedness of the city within the meaning of any state constitutional provision or statutory limitation, and shall never constitute nor give rise to a pecuniary liability of the city or a charge against its general credit or taxing powers, and such fact shall be plainly stated on the face of each such bond. All bonds issued under the authority of this act and all interest coupons applicable thereto shall be construed to be negotiable instruments, despite the fact that they are payable solely from a specified source.
Section 13. No bond issued hereunder shall bear more than one (1) rate of interest; each bond shall bear interest from its date to its stated maturity date at the interest *61 rate specified on the bonds; all bonds of the same maturity shall bear the same rate of interest from date to maturity. All interest accruing on bonds issued hereunder shall be payable semiannually or annually, except that the first interest coupon attached to any such bond may be for any period not exceeding one (1) year. No interest payment shall be evidenced by more than one (1) coupon and neither cancelled nor supplemental coupons shall be permitted.
Section 14. All bonds shall be executed on behalf of the city by the manual or facsimile signature of the mayor and shall be countersigned by the manual or facsimile signature of the city clerk; provided, that at least one (1) signature on each bond shall be manual. All coupons shall be executed on behalf of the city by the facsimile signatures of the mayor and city clerk. If the officers whose signatures or countersignatures appear on the bonds or interest coupons shall cease to be such officers before delivery of the bonds, such signatures or countersignatures shall nevertheless be valid and sufficient for all purposes the same as if they had remained in office until such delivery.
Section 15. Bonds issued under the provisions of this act shall be legal investments for commercial banks, savings and loan associations and insurance companies organized under the laws of this state.
Section 16. The bonds authorized by this act and the income therefrom, all mortgages or deeds of trust executed as security therefor, all lease or purchase agreements made pursuant to the provisions hereof, all purchases required to establish projects and financed by bond proceeds shall be exempt from all taxation in the State of Mississippi except the contractors' tax imposed by Section 27-65-21, and all facilities included in the projects and the revenue derived therefrom and from any lease thereof shall be exempt from all taxation in the State of Mississippi, except the tax levied by Section 27-65-21.
Section 17. This act, without reference to any other statute, shall be deemed to be full and complete authority for the issuance of the aforesaid bonds, and shall be construed as an additional and alternative method therefor, and none of the present restrictions, requirements, conditions or limitations of law applicable to the issuance or sale of bonds, notes or other obligations by municipalities in this state shall apply to the issuance and sale of bonds under this act, and no proceedings shall be required for the issuance of such bonds other than those provided for and required herein, and all powers necessary to be exercised in order to carry out the provisions of this act, are hereby conferred.
Section 18. This act shall take effect and be in force from and after its passage.
Approved: April 14, 1977